**Elwood L. SEE, Petitioner,**

**v.**

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY; Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

**No. 93–1794.**

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1994.

Decided Sept. 28, 1994.

---

**ARGUED:** Fred Calvin Alexander, Jr., McGuire, Woods, Battle & Boothe, Alexandria, VA, for petitioner. Laura Jessica Stomski, Office of the Solicitor, U.S. Dept. of Labor, Washington, DC, for respondent Director; Gary Lewis Crawford, Clarke, Crawford & Bonifant, Gaithersburg, MD, for respondent WMATA. **ON BRIEF:** Thomas S. Williamson, Jr., Solicitor of Labor, Carol A.

De Deo, Associate Solicitor, Janet R. Dunlop, Counsel for Longshore, Office of the Solicitor, U.S. Dept. of Labor, Washington, DC, for respondent Director.

Before MURNAGHAN and WILLIAMS, Circuit Judges, and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge WILLIAMS wrote the opinion, in which Judge MURNAGHAN and Judge HILTON joined.

## OPINION

WILLIAMS, Circuit Judge:

Elwood See appeals from the final decision of the Benefits Review Board (BRB) denying his petition for temporary total disability benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1988).[1] Our review of the record and the decisions by the administrative law judge (ALJ) and the BRB reveals several errors warranting reversal and remand for further proceedings consistent with this opinion.

### I.

#### A.

On June 22, 1981, during the course of his employment as a bus driver for the Washington Metropolitan Area Transit Authority (WMATA), the forty-two year old See was injured in Arlington, Virginia, when an automobile ran a stop sign and struck the commuter bus See was driving. At the time of his injury, See resided with his family in Falls Church, Virginia, a suburb of Washington, D.C.

During the following nine months, See complained of constant pain extending down his neck and through his back into both legs. The general consensus of five physicians who examined See during this period, including an orthopedic surgeon and a neurosurgeon, was that See had suffered a cervical and lumbar strain. At least one doctor noted a degenerative arthritic condition that predated See's accident.

In March 1982, See received medical clearance to return to limited job duties, but continuing pain rendered him incapable of driving a bus. WMATA later permitted See to test for the alternative position of station attendant. In January 1983, WMATA Medical Director Dr. Maurice Sislen declared See medically disqualified for the station attendant position. See retired from WMATA on total disability the following month, and, in May 1983, See moved 167 miles away to Franklin, West Virginia.

Medical evaluations and treatments continued after See's retirement, with differing results as to the degree of his physical impairments. On April 20, 1985, accepting the medical opinions of some of the examining physicians that See was no longer disabled, WMATA unilaterally suspended its voluntary payments of temporary total disability benefits. Thereafter, See petitioned for the continuation of benefits and medical expenses.

#### B.

Because irregularities in the administrative proceedings are significant in our review of this case, a detailed description of the various proceedings before the ALJ and the BRB is necessary.

At the January 1987 hearing on See's petition for benefits, the ALJ considered the medical evidence and See's testimony that continuing pain had kept him from working since March 1982. Jeffrey Nathan, executive vice president of the Safari Land Hunting Corporation, testified on behalf of WMATA to statements by his father concerning several tasks of manual labor performed by See and his brother Elmer See in 1984 at a hunting lodge in Mathias, West Virginia, owned and operated by the company. Nathan personally observed See engaging in general farming duties and operating a sanding machine at the lodge in the fall of 1983. In rebuttal, See denied performing any manual labor at the lodge. Finally, WMATA

---

[1.] As a District of Columbia employee injured in the course of his employment prior to July 24, 1982, See's claims are governed by the LHWCA.

*See Durrah v. Washington Metro. Area Transit Auth.,* 760 F.2d 322, 324 n. 1 (D.C.Cir.1985).

proffered a November/December 1986 labor market survey of the Washington metropolitan area by Vocational Consultant Carmela Rega.

The ALJ concluded that See was, and remained to that date, totally disabled, and awarded the appropriate benefits and medical expenses. Based on See's inability to return to his position as bus driver, the absence of proof within Rega's labor survey that the proposed alternative positions were available between 1982 and 1985, and See's "credible" and "emphatic denial[s]" of Nathan's hearsay-ridden testimony, the ALJ found that WMATA had not rebutted See's showing of total disability between 1982 and 1985. (J.A. at 10–12.) The ALJ further ruled, based on the medical evidence and See's "credible" testimony about his pain and physical condition, that See suffered from severe neck and back problems stemming from the 1981 accident that rendered him "[in]capable of returning to work as a bus driver during the period from April 20, 1985 through the present." (J.A. at 12, 13.) Finally, citing See's testimony concerning his move[2] and the "common knowledge that Washington, D.C. is one of the most expensive metropolitan areas in the nation," the ALJ found that See had moved from Washington to West Virginia for "legitimate economic reasons," and rejected Rega's labor survey of the Washington market. (J.A. at 14.) WMATA's failure to proffer evidence of suitable alternative employment in West Virginia prevented WMATA from rebutting See's demonstrated total disability since April 20, 1985.

On appeal, the BRB affirmed the ALJ's conclusion that See was unable to perform his usual job after the 1981 accident. However, the BRB identified two bases for vacatur of the ALJ's finding that WMATA had

failed to demonstrate suitable alternative employment or post-retirement wage-earning capacity. First, the BRB rejected the ALJ's disavowal of Nathan's testimony because of the ALJ's failure to account for inconsistencies between See's testimony and other evidence of record, including checks made payable to See for various services rendered at the lodge and Nathan's personal observations of See performing manual labor at the lodge. Second, the BRB found error in the ALJ's renunciation of Rega's labor survey because, according to the BRB, "there is no evidence to support claimant's statement that he moved to West Virginia from the Washington, D.C. area for economic reasons" and, as the situs of See's injury, the Washington area "is a relevant labor market for purposes of establishing suitable alternative employment." (J.A. at 21.) The BRB therefore remanded the case for reconsideration of the issue of the availability of suitable alternative employment.

On remand, the case took a curious twist. After describing the evidence of record relating to Nathan's testimony, the ALJ "[a]ccept[ed] Mr. Nathan's testimony in its entirety, since the Board ha[d] found it credible." (J.A. at 24.) However, the ALJ rejected Nathan's testimony as evidence of suitable alternative employment because the alleged sundry tasks did not establish a particular job, range of regular and continuing employment opportunities, or potential wage-earning capacity.

Because of the BRB's identification of Washington as the relevant labor market, the ALJ then considered "whether the positions [in Rega's survey] are consistent with the claimant's complex of symptoms." (J.A. at 25.) The ALJ conclusorily determined that the jobs described in Rega's survey "do not require the physical exertion necessary to

---

**2.** Elicited by his counsel at the ALJ hearing, See's uncontroverted testimony concerning his relocation was as follows:

Q You've lived in Franklin, West Virginia since May of 1983?
A Yes, sir.
Q And why did you move to West Virginia, Mr. See?
A Because the cost of living was cheaper up there, and I could afford to live up there I thought.

Q What was your job status at that time?
A My job status—I didn't have any. They retired me as of February 1st of '83 on total disability.
Q Did you find that you could live in the Washington area with you [sic] family based on what you were being paid compensation and what your retirement income was?
A No, sir.
(J.A. at 68–69.)

drive a bus." (J.A. at 25.) Relying on Nathan's testimony of See's activities at the lodge, the ALJ opined that See's "complaint about pain is exaggerated, and the testimony about physical movements quite vague and consistent with the performance of light work." (J.A. at 25.) The ALJ also ruled that most of the jobs described in Rega's labor survey "are consistent with claimant's mental and physical capabilities." (J.A. at 25.) In conclusion, the ALJ found that See was totally disabled from the date of his accident through April 20, 1985, and only partially disabled thereafter. Temporary partial disability benefits and medical expenses dating back to April 25, 1985, were awarded.

On appeal by See, the BRB affirmed the ALJ's determination that Rega's labor survey adequately established the availability of suitable alternative employment. However, because November 1986 was the earliest date of employment availability established by the survey, the BRB modified the award to provide for temporary total disability benefits through October 1986 and partial disability benefits beginning in November 1986. See now appeals to this court, claiming entitlement to total disability benefits continuing beyond October 1986 to the present.

## II.

A claimant for disability benefits under the LHWCA must first establish total disability by demonstrating his inability to return to his former employ. *Newport News Shipbuilding & Dry Dock Co. v. Tann,* 841 F.2d 540, 542 (4th Cir.1988). The burden then shifts to the employer to rebut disability by proving suitable alternative employment available upon a reasonably diligent search by the claimant. *Id.* An employer may satisfy this burden "[b]y proving that the injured employee retains the capacity to earn wages in regular, continuous employment." *Lentz v. Cottman Co.,* 852 F.2d 129, 131 (4th Cir. 1988). Relevant factors in this inquiry include the claimant's age, background, employment history and experience, and intellectual and physical capabilities, and the reasonable availability of jobs "in the community for which the claimant is able to compete and

which he could realistically and likely secure." *Trans–State Dredging v. Benefits Review Bd.,* 731 F.2d 199, 201 (4th Cir.1984) (quoting *New Orleans (Gulfwide) Stevedores v. Turner,* 661 F.2d 1031, 1042–43 (5th Cir. 1981)). The claimant may then counter a showing of suitable alternative employment by demonstrating a diligent but unsuccessful search for such employment. *Tann,* 841 F.2d at 542.

Our review of BRB decisions under the LHWCA is limited to a search for errors of law and deviations from the statutory conclusiveness afforded to those factual findings by the ALJ that are supported by substantial evidence. 33 U.S.C. § 921(b)(3) (1988); *Tann,* 841 F.2d at 543. Substantial evidence, described as "more than a scintilla but less than a preponderance," is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Elliott v. Administrator, Animal & Plant Health Inspection Serv.,* 990 F.2d 140, 144 (4th Cir.) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)), *cert. denied,* ——— U.S. ———, 114 S.Ct. 191, 126 L.Ed.2d 149 (1993). We must defer to the ALJ's credibility determinations and inferences from the evidence, despite our perception of other, more reasonable conclusions from the evidence. *Tann,* 841 F.2d at 543; *see Kellough v. Heckler,* 785 F.2d 1147, 1150 n. 3 (4th Cir.1986) (appellate deference accorded to findings of fact by ALJ, *not* by BRB).

The focus of this appeal is on the propriety of the ALJ's finding in his second opinion that, because suitable alternative employment was available after April 1985, See's physical impairment improved from total disability to partial disability, thereby warranting a corresponding reduction in benefits. According to See, the ALJ's finding of suitable alternative employment was erroneous in that it: (1) relied on a labor survey that did not address the relevant labor market; (2) represented both a misreading of the BRB's remand order and a complete, unsupported abandonment of the ALJ's previous medical evidence findings; and (3) included an inaccurate determination that many of the jobs in the survey were consistent with See's

capabilities and that such positions could be realistically secured and performed by See. We begin by looking at the question of the relevant labor market.

## III.

■ Under the LHWCA, "disability" is defined as an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other·employment." 33 U.S.C. § 902(10) (1988). In distinguishing between total and partial disability, the Act looks primarily at the claimant's "wage-earning capacity." *See, e.g.,* 33 U.S.C. § 908(e), (h) (1988). Because of the statutory focus on "the claimant's *capacity* for work, not actual employment," *Tann,* 841 F.2d at 543 (emphasis in original), disability under the LHWCA is "an economic, rather than purely physical, concept." *Newport News Shipbuilding & Dry Dock Co. v. Director, OWCP,* 592 F.2d 762, 765 (4th Cir.1979); *see also Diamond M. Drilling Co. v. Marshall,* 577 F.2d 1003, 1006 (5th Cir. 1978) (total disability is possible under LHWCA when claimant is "physically capable of performing certain work but otherwise unable to secure that particular kind of work"). "The statute's equation of disability with 'wage-earning capacity' reflects a concern for the economic consequences of job-related injuries...." *McBride v. Eastman Kodak Co.,* 844 F.2d 797, 799 (D.C.Cir.1988).

■ A determination of the relevant labor market for purposes of determining eligibility for LHWCA benefits should reflect the Act's "concern for ... economic consequences." Our survey of LHWCA cases reveals the use of enigmatic terms of art that do not expressly contemplate the economic consequences of an individual claimant's injuries. Those cases toss about such phrases as "the relevant community," *Roger's Terminal & Shipping Corp. v. Director, OWCP,* 784 F.2d 687, 691 (5th Cir.), *cert. denied,* 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 51 (1986), the "local" or "surrounding" community, *P & M Crane Co. v. Hayes,* 930 F.2d 424, 431 (5th Cir.1991), "the geographic area where the claimant resides," *McBride,* 844 F.2d at 800, the community in which "the claimant is able to compete," *Turner,* 661 F.2d at 1042, or

"the local economy," *Hicks v. Gardner,* 393 F.2d 299, 301 (4th Cir.1968), without scrutinizing the circumstances surrounding any post-injury relocation.

■ We find the most persuasive definition of the relevant labor market in a concurring opinion by our late Chief Judge Harrison Winter: "It is by now well-established that, in order to defeat a claim for benefits as a result of an alleged permanent total disability, the burden is on the employer to prove the existence of a suitable job presently available to the claimant *in the community in which he lives.*" *Haughton Elevator Co. v. Lewis,* 572 F.2d 447, 451 (4th Cir.1978) (Winter, J., concurring) (emphasis added); *see also Godfrey v. Henderson,* 222 F.2d 845, 849 (5th Cir.1955) (focusing on work "available in the community in which the employee resides"). Faced with a similar situation in which the claimant moved to another state (Florida) after the accident "because there was no work available for him in the Washington area, where he resided at the time of his original injury, and because his son had asthma," Judge˙ Winter voted to affirm an award of total disability benefits where the employer had failed to proffer evidence of available alternative employment "in the community in which [the claimant] *presently lives.*" *Lewis,* 572 F.2d at 451 & n. 6 (emphasis added); *see also Trans–State Dredging,* 731 F.2d at 200 n. 1, 202 (permitting proof of suitable alternative employment with a six-month-old labor survey of the Florida market, despite the fact that the claimant had moved to Florida after his injury in Beaufort, South Carolina).

WMATA contends that its burden of proving suitable alternative employment should focus solely on the community where See resided at the time of his injury, i.e., Falls Church, and has cited several BRB decisions in support of that position. *See, e.g., Nguyen v. Ebbtide Fabricators, Inc.,* 19 BRBS 143, 145 & n. 3 (1986) ("Employer need only show that suitable alternative employment is available to claimant in the area where he worked at the time of his injury"; rejecting claimant's contention that his relocation was economically motivated, because of lack of supporting evidence in the record). According

to WMATA, any other reading "could mean that a finding of total disability might attend not to limitations related to the injury, but rather the claimant's personal choice to relocate to an area with fewer available jobs," and thereby unduly burden an employer by requiring completion of a labor market survey in a remote community in order to rebut a demonstration of total disability. (Appellee's Br. at 6.) Moreover, WMATA points to the BRB's rejection of Franklin, West Virginia, as the relevant labor market based on the absence of substantial evidence supporting the ALJ's finding that See's relocation was legitimately prompted by economic concerns.

 We disagree. First, by disregarding See's testimony concerning the motivation for his relocation, the BRB engaged in the kind of fact finding and credibility determinations reserved exclusively for the ALJ.[3] See Mijangos v. Avondale Shipyards, Inc., 948 F.2d 941, 944–45 (5th Cir.1991); Tann, 841 F.2d at 543; see also 33 U.S.C. § 921(b)(3) (ALJ's factual findings are "conclusive" if supported by substantial evidence); 20 C.F.R. § 802.301(a) (1994) ("The Benefits Review Board is not empowered to engage in a de novo proceeding or unrestricted review of a case brought before it.... [The ALJ's] findings of fact and conclusions of law may be set aside only if they are not ... supported by substantial evidence ... or in accordance with law."). The BRB's rejection of the ALJ's finding that Franklin, West Virginia, was the relevant labor market, and its substitution of Washington, D.C., as a relevant market, constituted an improper usurpation of the ALJ's authority in administrative proceedings.[4] *Freeman United Coal*

*Mining Co. v. Benefits Review Bd.,* 879 F.2d 245, 249 (7th Cir.1989). Regardless of its perception of the appropriate inferences arising from the evidence, the BRB cannot, as it did in its first review of the ALJ's order, substitute its own fact findings and judgment for that of the ALJ. *Mijangos,* 948 F.2d at 944–45. See's uncontroverted testimony concerning his move to West Virginia, deemed credible by the ALJ, constituted substantial evidence of the legitimacy of those motivations and was properly considered within the ALJ's disability determinations. *See* 33 U.S.C. § 908(h) (in determining claimant's wage-earning capacity, ALJ may consider "any other factors or circumstances in the case which may affect [the claimant's] capacity to earn wages in his disabled condition."). Because the BRB erroneously rejected those findings, we must reverse that portion of the BRB's first order, and reinstate the ALJ's credibility determination as to See's relocation testimony.

 The presence of a legitimate purpose influencing a post-injury relocation is a significant factor warranting consideration in a determination of the relevant labor market. A move predicated on a legitimate intent to reduce an injured claimant's cost of living is consistent with the LHWCA's perception of disability as a physical and economic concept, in that such relocation can mitigate the economic consequences of the claimant's impairment.

It is conceivable that an injured claimant could move to a locale so economically depressed that alternative job opportunities are virtually unavailable, thereby practically dictating the success of his benefits petition, or

---

3. WMATA has made a passing argument that, "in view of the fact that Mr. See elected disability retirement beginning in early 1983" and then moved to West Virginia, the BRB "correctly held" that See's relocation was induced by retirement rather than economic reasons. (Appellee's Br. at 5.) Although noting that See was receiving *disability* benefits at the time of his move, the BRB made no determination that retirement prompted See's move. Had such a determination been made, it also would have been invalid as an act beyond the scope of BRB's authority.

4. See argues that, on remand, the ALJ erroneously interpreted the BRB's finding that Wash-

ington "is a relevant labor market for purposes of establishing suitable alternative employment," (J.A. at 21) (emphasis added), as a ruling that "the Washington metropolitan area is *the* relevant labor market." (J.A. at 25) (emphasis added). By eliminating West Virginia as a relevant market, the BRB effectively restricted the relevant market inquiry to the only other geographic location involved in this case, namely the location of See's original injury. The ALJ's ruling on remand merely gave practical effect to the BRB's rejection of West Virginia as a relevant labor market.

one so geographically distant that an employer is unable, without extreme hardship, to obtain a reliable labor market survey for purposes of demonstrating suitable alternative employment. Similar evidentiary hardships would be visited upon an employer where the claimant is excessively transient after the injury. *See Joyner v. District of Columbia Dep't of Employment Servs.*, 502 A.2d 1027, 1030 (D.C.1986) ("unduly onerous" to require employer to analyze labor markets in each of the five geographical locations where claimant lived after injury). Conversely, an inflexible rule bounding an injured claimant to the community where he was injured would needlessly, and possibly unlawfully, fetter his personal choices as to possible residences as well as hamper relocation efforts for the purpose of securing employment. Such a rule would contravene both the LHWCA's economic focus on a "claimant's *capacity* for work," *Tann*, 841 F.2d at 543 (emphasis in original), and the policy of liberal construction of the LHWCA to provide a full and adequate remedy for an injured employee. *Potomac Elec. Power Co. v. Director, OWCP*, 449 U.S. 268, 281, 101 S.Ct. 509, 516, 66 L.Ed.2d 446 (1980).

 In this case, were we to accept WMATA's position, See would be required, as of April 20, 1985, the date he was allegedly capable of returning to gainful employment, to seek employment in a labor market 167 miles away which he abandoned two years earlier for legitimate economic reasons when he was considered totally disabled.

Such a result would be both irrational and inequitable to an injured claimant whose physical recovery is, at best, partial. Therefore, we reject WMATA's position that the relevant labor market is always the location where the claimant was injured. If there are legitimate reasons for a claimant's relocation, the claimant's new community may be the relevant labor market. To avoid inequities to both the claimant and the employer, the ALJ's determination of the relevant labor market should include consideration of such factors as the claimant's residence at the time of his filing for disability benefits, his motivation for relocation after the accident, the legitimacy of that motivation, the dura-

tion of his stay in that new community, his ties to that new community, the availability of suitable job opportunities in the new community as opposed to those in his former residence, and the degree of undue prejudice to the employer in proving suitable alternative employment in the claimant's new community.

 Our conclusion is indeed contrary to such BRB decisions as *Nguyen*. However, because the BRB is not a policymaking agency, its interpretation of the terms of the LHWCA is not entitled to any special deference from this court. *Potomac Electric Power Co.*, 449 U.S. at 278 n. 18, 101 S.Ct. at 514 n. 18. In fact, our conclusion that a legitimately motivated postaccident relocation can create a new relevant labor market is supported by an identical conclusion reached in the brief filed in this case by the Director of the Office of Workers' Compensation Programs of the United States Department of Labor. The position advocated in the Director's brief, which represents a reasonable interpretation of an ambiguous or silent statutory provision by the agency charged with administering that law, is entitled to judicial deference. *See Kennedy v. Shalala*, 995 F.2d 28, 30 & n. 3 (4th Cir.1993); *Newport News Shipbuilding & Dry Dock Co. v. Howard*, 904 F.2d 206, 208–09 (4th Cir.1990).

 In the instant case, See had lived in West Virginia for nearly two years when WMATA terminated his benefits, thereby prompting him to file a petition for continued disability benefits during his residency in that state. There is substantial evidence supporting the economic reasons for See's move to West Virginia and the legitimacy of those reasons. Conversely, there is nothing in the record concerning such factors as See's ties to West Virginia, suitable employment availability in West Virginia versus Washington, and potential undue prejudice to WMATA in preparing a labor market survey for Franklin, West Virginia. The ALJ should be afforded the first opportunity to consider those factors and their effect, if any, on the relevant labor market for this case. *See Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.*, 676 F.2d 110, 115 (4th Cir.1982) (because the ALJ is the fact-

finder, the BRB should not rule upon an issue before the ALJ has had an opportunity to consider it first).

To summarize, we find that the BRB erred by rejecting the ALJ's original determination that See had a legitimate economic reason for his move, a factual finding that was supported by substantial evidence. The BRB also erred by rejecting the ALJ's determination that Franklin, West Virginia, was the relevant labor market. We reverse the BRB's relevant labor market determination, and the ALJ's decision on remand as restricted by the BRB's relevant market determination, and remand for further consideration of whether, construing the record in light of factors such as those we have identified, Franklin, West Virginia, is indeed the relevant labor market and whether WMATA can demonstrate suitable alternative employment in the relevant market.

## IV.

See's remaining allegations of error focus on the ALJ's actions on remand. See argues that, by misconstruing the remand order, the ALJ erroneously revisited the medical evidence and, without justification or explanation, abandoned his prior findings of See's total disability after April 20, 1985. See also contends that the ALJ's finding of consistency between See's physical and mental capabilities and several of the jobs in WMATA's labor survey was incorrect in that it was not supported by substantial evidence. We find merit in both of these arguments. Moreover, we find that the ALJ inappropriately deferred to the BRB's purported credibility determination of Jeffrey Nathan and erroneously relied upon that testimony in concluding that See's complaints of pain were "exaggerated." (J.A. at 25.) Although further proceedings are already needed for determining the relevant labor market for this case, we address these errors in order to avoid their repetition on remand.

■ An ALJ's decision is statutorily required to include a discussion of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A) (1988). Strict adher-

ence to this statutorily-imposed obligation is "critical to the appellate review process.... The courts have respected this requirement [in § 557(c)(3)(A)] by remanding cases where the reasoning for the a.l.j.'s[sic] conclusion is lacking and therefore presents inadequate information to accommodate a thorough review." *Director, OWCP v. Congleton,* 743 F.2d 428, 429 (6th Cir.1984). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, ... an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir.1981). This court has long required specific references to the evidence supporting an ALJ's decision as part of the ALJ's "duty of explanation." *Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir.1985); *see also King v. Califano,* 615 F.2d 1018, 1020 (4th Cir.1980). Conversely, when faced with evidence in the record contradicting his conclusion, an ALJ must affirmatively reject that contradictory evidence and explain his rationale for so doing. *CNA Ins. Co. v. Legrow,* 935 F.2d 430, 436 (1st Cir.1991); *Smith v. Heckler,* 782 F.2d 1176, 1181 (4th Cir.1986); *see also Congleton,* 743 F.2d at 430 ("[A]n a.l.j.'s [sic] conclusory opinion, which does not encompass a discussion of the evidence contrary to his findings, does not warrant affirmance."); *Cotter,* 642 F.2d at 706 ("[T]here is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record.").

■ The ALJ's repeated failure to comply with his statutory duty of explanation on remand requires further proceedings on the issue of suitable alternative employment. The BRB only remanded this case for a determination of whether suitable alternative employment was proven by Nathan's testimony, with potential corroboration by the checks to See for services rendered, or by Rega's labor survey of the Washington market. However, the ALJ lunged into an indiscriminate reconsideration of the entire record, resulting in conclusory findings that

were diametrically opposed to his previously rendered, well-reasoned conclusions.

Instead of reconsidering Nathan's credibility in light of that evidence, the ALJ construed the remand order as a BRB determination of Nathan's credibility, and gave that determination preclusive effect. There is no such credibility determination in the BRB's remand order. The ALJ effectively abdicated the nondelegable task of credibility determination which, as discussed above, is within his exclusive province and beyond the BRB's authority. *See, e.g., Mijangos,* 948 F.2d at 944–45 (BRB exceeded its authority when it reweighed evidence and assessed witness credibility); *Freeman United Coal Mining Co.,* 879 F.2d at 249 (task of weighing conflicting evidence is within sole province of ALJ). The ALJ's subsequent conclusion, that See's testimony concerning his pain and physical condition was exaggerated and unreliable, is vitiated by his reliance on what he erroneously perceived as a credibility determination by the BRB.

Moreover, the ALJ's new finding that See's allegations of pain were exaggerated marks a complete departure, without explanation, from the ALJ's previous finding: "I find Claimant's testimony about his pain and physical condition to be credible." (J.A. at 12.) There is no mention of, or attempt to distinguish, that earlier conclusion or the conflicting medical evidence.[5] Nor did the ALJ explain his decision to revisit the issue of See's physical condition. We question the propriety of such action when, after noting that WMATA "raised no reversible error" as to the ALJ's weighing of the conflicting med-

ical evidence or pertinent credibility determinations, the BRB had already affirmed the ALJ's conclusion that See had established a prima facie case of total disability by proving that he "could not perform his usual job following his 1981 work injury." (J.A. at 18.) The absence of explicit discussion pertaining to these conclusions effectively precludes proper appellate review.

There are similar problems with regard to the ALJ's conclusion that See could perform the vocational alternatives described in Rega's labor survey. The ALJ's first conclusory determination, that the alternative jobs proposed by Rega do not require the physical exertion demanded of a local bus driver, is not supported by any identification of the exertional requirements of bus driving or the alternative jobs, or by a comparison of those requirements. At least three of the vocational alternatives identified by Rega—chauffeur, mobile lounge driver, and coach driver—are virtually identical to See's previous employ, requiring the same kind of physical exertion previously expected of See. This conclusory comparison of exertional requirements does not satisfy the dictates of § 557(c)(3)(A).

The ALJ follows that determination with the uncorroborated observation that "most of the positions" described in Rega's labor survey were "consistent with claimant's mental and physical capabilities." (J.A. at 26.) Again, the ALJ provided no supporting discussion, this time pertaining to the boundaries of See's capabilities, the conflicting accounts of his medical condition, or the exertional requirements of the proposed jobs. A particular problem with the conclusory na-

---

5. In his original opinion, the ALJ accepted the opinion of See's treating physician, Dr. Henry Taylor, that, despite some pre-accident spinal degeneration, the 1981 bus accident precipitated See's pain and rendered him totally disabled due to chronic pain syndrome associated with a major depressive disorder. The ALJ supported that credibility determination with a similar causation opinion by neurosurgeon Dr. Norman Horwitz, and the diagnoses of degenerative spinal conditions by Drs. Taylor, John Leabhart, Edward Lang, and Galen Craun.

In his second opinion, without explanation, the ALJ abandoned that evidence and his prior credibility determinations thereon in favor of such evidence as Dr. Lang's opinion that there was no clinical evidence of organic neurological disease and no causal connection between the 1981 acci-

dent and the herniated disc subsequently revealed in a myelogram and CT scan performed in September 1986. The ALJ also apparently accepted the opinion of Dr. Robert Gordon that, although See suffered from almost total body pain with a large functional component, there were no injury-related restrictions or limitations and no physiological evidence of permanent physical impairment stemming from the accident. The ALJ also ignored his observation in his original opinion that "Dr. Taylor's November 1986 statement that Claimant is experiencing pain which is so disabling as to interfere with his ability to perform any sort of work raises the question of whether Claimant even could perform the light duty jobs in Employer's labor market survey." (J.A. at 14 n. 8).

ture of this determination is the ALJ's failure to consider the fact determined by WMATA's own medical director that, at least as of 1983, See was physically incapable of employment as a station attendant. The minimal physical exertional requirements of that position [6] would seemingly entail the same degree of exertion required by the alternative positions proposed by Rega. Given the paucity of the ALJ's discussion regarding the correlation between See's capabilities and the proposed alternative positions, we have no basis for ascertaining whether that determination is supported by substantial evidence.

Finally, based on the number and variety of alternative positions enumerated by Rega, the ALJ found that See could secure employment upon a diligent search. However, the ALJ did not consider that all of Rega's proposed alternative jobs, except the one customer service representative position in Falls Church,[7] would require time-consuming commutes from See's prior Falls Church residence through the Washington, D.C. area to locations ranging from Alexandria, Virginia, and downtown Washington to Landover and Silver Spring, Maryland. Because See's impairment has rendered him incapable of driving and, therefore, potentially unable to make such lengthy commutes on a daily basis, we question the ALJ's conclusory opinion that See could reasonably secure and maintain any one of those jobs. *See Tann,* 841 F.2d at 543 (finding alternative positions requiring twenty to twenty-five mile commutes "geographically available" where claimant's physical disabilities did not impair his ability to make those commutes). Hence, the ALJ was again neglectful of his duty to explain.

The ALJ's conclusory findings and uncorroborated conclusions on remand do not warrant affirmance by either this court or the BRB because the ALJ failed to discuss supporting evidence or to distinguish contradictory evidence consistent with his statutory duty to explain his determinations. 5 U.S.C. § 557(c)(3)(A); *Congleton,* 743 F.2d at 429–

30. Notwithstanding the remand for reconsideration of the relevant labor market, further proceedings are needed before we can determine whether the ALJ's findings of suitable alternative employment are supported by substantial evidence. The ALJ has a statutory duty, in light of both supporting and contradicting evidence, to give an explicit discussion of his findings as to the availability of suitable alternative employment in the relevant labor market, the precise extent of See's physical and mental capabilities and the exertional limitations imposed by his impairment, the suitability of available positions in light of See's condition, and See's ability to secure and maintain such positions. Moreover, See should be afforded the opportunity to proffer evidence, if any, on the issue of a diligent but unsuccessful search for suitable alternative employment.

### V.

For the reasons stated herein, we reverse the BRB's denial of See's petition for temporary total disability benefits and remand the case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED.*

---

6. According to See's uncontroverted testimony, the station attendant position included such tasks as "answering questions and watching the television screens and computer-like things and watching for farecards and helping people through the gates." (J.A. at 71.)

7. With regard to that one position, we have previously stated that it is "manifestly unreasonable" to conclude that a claimant could seek out and secure a single employment opportunity. *Lentz,* 852 F.2d at 131.