**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VETUS C. BROWN,
Petitioner,

v.

NEWPORT NEWS SHIPBUILDING AND

No. 96-2622

DRY DOCK COMPANY; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(94-610)

Argued: March 4, 1998

Decided: June 4, 1998

Before MURNAGHAN, ERVIN, and WILKINS,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Elliott Walsh, RUTTER & MONTAGNA, L.L.P.,
Norfolk, Virginia, for Petitioner. Benjamin McMullan Mason,
MASON & MASON, P.C., Newport News, Virginia, for Respon-
dents. **ON BRIEF:** Matthew H. Kraft, RUTTER & MONTAGNA,

L.L.P., Norfolk, Virginia, for Petitioner. Dean C. Berry, Assistant General Counsel, NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Newport News, Virginia, for Respondent Newport News Shipbuilding.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Vetus Brown petitions for review of a final order of the Department of Labor's Benefits Review Board ("BRB" or "Board"). Finding that Newport News Shipbuilding and Dry Dock Co. ("NNS") had offered Brown employment that conformed to his medical restrictions, the Administrative Law Judge ("ALJ") denied Brown's claim for temporary partial disability benefits for loss of wage earning capacity. Brown noted a timely appeal to the BRB. After a year without action the BRB was deemed to have affirmed the ALJ's decision pursuant to the provisions of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134,§ 101(d), 110 Stat. 1321, 1321-29.

On petition for review to this court, Brown argues that the position offered by NNS was not compatible with his post-injury physical capacity and medical restrictions. In the alternative, Brown contends that a remand is required because the ALJ's Decision and Order failed sufficiently to explicate the evidentiary basis for his conclusions. Finding no error, we affirm.

I

NNS employed Brown in the shipyard's rigging department. Brown's pre-injury duties included building stages used in constructing ships, directing crane operators, and moving heavy equipment on

2

submarines and carriers. On March 10, 1986, Brown fell from staging to the ground, a distance of approximately four feet, when a wrench he was using to tighten a nut slipped. As a result of the fall, Brown suffered injuries including a blow to the head. Following the accident, Brown complained of severe and persistent headaches that were aggravated by noise and light.

Brown obtained treatment for his headaches from Dr. Gilbert Snider, a neurologist. Dr. Snider prescribed several medications and, in response to Brown's claim that loud noise intensified the severity of his headaches, recommended that NNS place Brown in a low-noise work environment.

Between March 10 and November 11, 1986, Brown endeavored to return to work at the shipyard several times. Each time, however, Brown complained that he could not abide the noise levels. Additions and changes to his medication proved unavailing. On November 11, 1986, NNS laid off Brown in a general reduction in force.

In February 1987, Dr. Snider determined that Brown could return to work under three restrictions. With respect to Brown's intolerance for loud noise, Dr. Snider recommended that Brown work in an area with a background noise level of no more than 90 decibels, and preferably no more than 85 decibels. Dr. Snider noted that a steady noise level of 90 decibels would be more readily tolerated than intermittent sounds of 90 decibels. Dr. Snider also recommended that Brown be permitted to use tinted lenses, and that he not work at heights of more than 50 feet.

In April or May 1987, Brown obtained a supervisory position at the Fort Eustis Exchange service station. Brown worked at the service station until July 1987, when NNS recalled Brown to work at the shipyard in the rigging department.

Brown reported to work at the shipyard on July 21, 1987. The rigging supervisor, Michael Burke, was informed of Brown's medical restrictions and assigned Brown to work under the hull of a ship under construction. Although Brown did not complain to Burke of noise-induced headaches on July 21 or July 22, he advised Dr. Snider by telephone that the work environment was aggravating his headaches.

3

In response to Brown's call, Dr. Snider requested that Brown be returned to "his prior job at a low noise level," be permitted to wear sunglasses, and not be required to wear a hardhat.*

Brown also visited the NNS clinic to complain of excessive noise. Clinic personnel asked Brown to wait while the noise levels in his work area were tested. Although testing revealed that the decibel levels under the ship hull were within the range recommended by Dr. Snider, Brown did not return to his assigned work at the shipyard after July 22, 1987.

On July 24, Brown reported to the shipyard to advise NNS of Dr. Snider's most recent restrictions. Brown was informed that the shipyard had work available within his restrictions and was warned about unauthorized leave. Nevertheless, Brown left the shipyard and returned to work at the Fort Eustis service station. On July 28, 1987, Brown again visited the shipyard and was offered work under the hull of a ship, which Brown refused. Based on his failure to report to work after July 22, Brown was released from union rolls effective July 27, 1987, for being absent without leave for five or more consecutive work days.

Pursuant to an agreement reached in February 1987, NNS paid Brown temporary total disability benefits from March 25, 1986, through May 3, 1987, excluding days Brown actually worked, and temporary partial disability benefits from May 4, 1987, through July 20, 1987. Brown's compensation was terminated when he was released from duty effective July 27, 1987.

Brown subsequently filed a claim for workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-50 ("LHWCA"), seeking medical benefits and reinstatement of temporary partial disability benefits for loss of wage earning capacity from July 23, 1987, and continuing. On March 6, 1990, the ALJ issued a Decision and Order awarding Brown the requested medical benefits, but denying Brown's claim for temporary partial disability payments.

_____

*Following a conversation with the NNS clinic physician, Dr. Lenthall, Dr. Snider eliminated the hard hat restriction.

4

Brown filed a timely appeal with the BRB. In a decision dated April 28, 1993, the BRB vacated the denial of disability benefits and remanded the case to the ALJ for further consideration because the ALJ had failed adequately to analyze and discuss the medical evidence relating to Brown's work restrictions and his ability to perform his job. The Board instructed the ALJ on remand to determine, in light of the medical evidence, whether Brown could perform his usual work or the work NNS offered him.

On remand, the ALJ concluded that the work offered to Brown in July 1987 was within the medical restrictions imposed by Dr. Snider and again denied Brown's claim for temporary partial disability payments. The ALJ's decision was deemed affirmed on September 12, 1996. Brown timely filed a petition for review on November 8, 1996.

Jurisdiction is present under 33 U.S.C. § 921(c). Ordinarily, we review decisions of the Board for errors of law and to determine whether the Board heeded the mandate of 33 U.S.C.§ 921(b)(3), which provides that the ALJ's findings of fact "shall be conclusive if supported by substantial evidence in the record considered as a whole." See See v. Washington Metro. Area Transit Auth., 36 F.3d 375, 380 (4th Cir. 1994); Newport News Shipbuilding and Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir. 1988). Absent a decision by the Board, we inquire whether the ALJ's decision was based on legal error or on factual findings not supported by substantial evidence. Substantial evidence, described as "more than a scintilla but less than a preponderance," is "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Elliott v. Administrator, Animal & Plant Health Inspection Serv., 990 F.2d 140, 144 (4th Cir. 1993) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). We defer to the ALJ's credibility determinations and inferences from the evidence, "despite our perception of other, more reasonable conclusions from the evidence." See, 36 F.3d at 380.

II

The principal question before us is whether the ALJ correctly concluded that the work NNS offered to Brown in July 1987 conformed to the restrictions dictated by Dr. Snider. A claimant for disability benefits under the LHWCA bears the burden of demonstrating that he

5

is unable to perform his usual work. See, 36 F.3d at 380. The burden then shifts to the employer to show the availability of suitable alternate employment. Id. The employer's burden may be satisfied "[b]y proving that the injured employee retains the capacity to earn wages in regular, continuous employment." Lentz v. Cottman Co., 852 F.2d 129, 131 (4th Cir. 1988).

The record contains substantial evidence to show that work was available within Brown's medical restrictions in the rigging department at NNS. Burke, the rigging supervisor to whom Brown reported, assigned Brown to "scrapping up," or removing materials from underneath the hull of a ship under construction. The job did not require Brown to work above ground level. Brown was permitted to wear sunglasses while he worked, but only when he was not under the ship. Burke explained that the work area was shadowed by the hull and light bulbs were required to provide adequate illumination.

An industrial hygienist for NNS assessed noise levels under the hull on July 23, 1987. A dosimeter was used to measure the average noise level, while a sound level meter took readings at two minute intervals. The records were reviewed by Larry Bonner, an industrial hygienist employed by NNS. Bonner testified that the average noise level under the hull was 80 decibels. The nine sound meter readings revealed decibel levels ranging from a low of 77 decibels to a high of 84. The average noise level and highest intermittent noise level were both within the preferable 85 decibel limit prescribed by Dr. Snider.

The proper use of earmuffs and earplugs would have further reduced Brown's exposure to noise. Chris Zambas, an audiologist, testified that properly sized and fitted earplugs reduce noise exposure by approximately 26 decibels. Dr. Lenthall stated that Brown was fitted with earplugs to be worn under earmuffs on May 29, 1986. The earmuffs used at NNS, and worn by Brown when working under the hull in July 1987, have a noise reduction rating of 22 to 25 decibels. When earplugs and earmuffs are used in combination, noise levels are reduced by approximately seven decibels more than by either earmuffs or earplugs alone.

With earmuffs alone, therefore, the average noise level to which Brown was exposed under the hull would have been 55 to 58 deci-

6

bels. The highest intermittent noise level would have been 59 to 62 decibels. Had Brown elected to wear both earmuffs and earplugs, a practice condoned by NNS, his exposure would have been further reduced to an average noise level of no more than 48 to 51 decibels, and an intermittent noise level of no more than 52 to 55 decibels.

The ALJ's conclusion that the work was within Brown's medical restrictions is not undermined by Bonner's testimony that noise levels at various locations in the shipyard infrequently and momentarily exceeded 115 decibels. With the proper use of earmuffs and earplugs, Brown's exposure to such noises would have been reduced to 86 decibels or less.

Brown argues, however, that Dr. Snider's specific restrictions were succeeded by a general recommendation that Brown not return to work at the shipyard. According to Brown, Dr. Snider's advice demonstrates Brown's inability to perform any work at NNS. We do not agree. Dr. Snider testified that his opinion was based solely on Brown's assertion that his headaches were aggravated whenever he worked at the shipyard, but were less severe when Brown worked at Fort Eustis. No objective medical evidence exists to corroborate Brown's claim. The ALJ expressly found that Brown was not credible, and we must defer to that determination. Tann, 841 F.2d at 543.

We conclude that there is substantial evidence to support the ALJ's finding that NNS provided employment to Brown within the specific restrictions prescribed by Dr. Snider. Furthermore, we find that the ALJ's Decision and Order contains an adequate explanation of the basis for the ALJ's conclusions. Therefore, the ALJ's denial of temporary partial disability benefits to Brown is

AFFIRMED.

7