UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NEWPORT NEWS SHIPBUILDING AND
DRY DOCK COMPANY,

*Petitioner,*

v.

QUEEN E. WIGGINS; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,

*Respondents.*

No. 00-2532

On Petition for Review of an Order
of the Benefits Review Board.
(99-699)

Argued: September 28, 2001

Decided: December 14, 2001

Before WILKINS, NIEMEYER, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Jonathan Henry Walker, MASON, COWARDIN &
MASON, P.C., Newport News, Virginia, for Petitioner. Gregory
Edward Camden, MONTAGNA, KLEIN & CAMDEN, L.L.P., Nor-
folk, Virginia, for Respondents.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Newport News Shipbuilding & Dry Dock Co. ("Newport") appeals from the Benefits Review Board's (the "Board") affirmance of an Administrative Law Judge's (the "ALJ") award of permanent total disability benefits to Queen Wiggins ("Wiggins") under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901-950 (the "Act"), claiming that Wiggins' part-time job as a newspaper carrier constituted "suitable alternate employment." Because substantial evidence supported the ALJ's finding that Wiggins' newspaper route did not establish a continuing ability to earn wages, and thus did not constitute suitable alternate employment, we affirm.

I.

A.

On May 9, 1995, Wiggins, who had worked at Newport as a welder since 1974, complained of pain in her hands and wrists that her treating physician, Dr. Thomas M. Stiles ("Dr. Stiles"), later diagnosed as bilateral carpal tunnel syndrome. After performing surgery on Wiggins' hands and wrists, Dr. Stiles assigned a two percent permanent disability rating and imposed permanent work restrictions.[1]

On May 16, 1995, Wiggins fell at work and injured the anterior portion of her left knee. A physician at the Newport clinic treated Wiggins' injury and placed her on temporary work restrictions. On August 31, 1995, however, Wiggins complained to Dr. Stiles that her

---

[1] The August 7, 1996 restrictions limited, inter alia, pushing and pulling involving the hands or arms and simple grasping involving the hands to a maximum of 2.5-5 hours per day. Dr. Stiles also limited firm grasping to a maximum of 1-2.5 hours per day.

knee was still "catching," "popping," and "giving way." J.A. at 135. Wiggins continued to experience problems, prompting Dr. Stiles to perform arthroscopic surgery on the knee in November 1996. Dr. Stiles imposed knee-related permanent work restrictions on February 6, 1997, which he amended sometime shortly after March 20, 1998.[2] Based on continued loss of motion, loss of cartilage, and pain, he assigned a permanent disability rating of fifteen percent to Wiggins' knee on September 10, 1997.

Because Wiggins' physical limitations prevented her from continuing her employment with Newport as a welder, in April 1996 the U.S. Department of Labor referred her to Charles DeMark ("DeMark"), a rehabilitation counselor, to assist her in finding alternate employment. Given Wiggins' physical and educational limitations, as well as the depressed nature of the job market near her hometown of Ahoskie, North Carolina, DeMark found only one job for Wiggins, a position as a newspaper carrier for the *Roanoke-Chowan News Herald*. Although DeMark urged Wiggins to apply for a position at the *News-Herald*, Wiggins actually was offered and accepted the carrier position without DeMark's knowledge. Dr. Stiles actually approved the position for Wiggins, but he did so on the basis of a general job description, and on the condition that she avoid "excessive walking." J.A. at 266-67.

Wiggins began her new job in July 1997, working four to five hours per day on each of three days per week. She devoted a fourth day of each week to collecting weekly payments from her customers. These efforts earned Wiggins seventeen cents per paper and approximately $102 per week, excluding vehicle, insurance, and fuel costs of approximately $25 to $35 dollars per week. The job required Wiggins to retrieve the papers from the *News-Herald* office, take them home to "re-roll" them, load them into her car, and deliver them to various customers around town. Wiggins testified that she re-rolled and deliv-

---

[2]This set of permanent restrictions prohibited, inter alia, walking in excess of 2-3 hours per day, standing and twisting for more than 4-5 hours per day, and any kneeling or squatting whatsoever. Dr. Stiles also limited Wiggins to jobs requiring her to carry no more than 10-20 pounds.

ered approximately 200 newspapers per day. The delivery process itself was undertaken largely on foot.

The evidence clearly shows that Wiggins experienced problems with her hands, wrists, and knee while discharging her new responsibilities. Wiggins testified, for example, that she experienced a "burning sensation" in her knee, and that it swelled and gave way if she walked too much or too quickly. J.A. at 87-89. "[A] lot of times," according to Wiggins, she was forced to halt the newspaper delivery process after three to five blocks of walking "[t]o help [her] knee." *Id.* She also testified that her right hand would "lock" while re-rolling the newspapers, causing pain to run, at times, up her entire arm to her shoulder. *Id.* at 87-89. Wiggins further testified that she sometimes received help from her children in carrying out her duties.

DeMark testified that while he had originally identified the carrier job for Wiggins, he later came to believe that it was inappropriate in light of her physical limitations. In this regard, DeMark testified to his belief that the job violated Wiggins' work restrictions and required her to put forth "extra effort" simply to perform her basic duties. J.A. at 240. DeMark expressed particular concern about Wiggins' ability to comply with the restrictions pertaining to pushing, pulling, simple grasping, squatting, and kneeling, particularly in cold weather. He further testified to his belief that Wiggins took the job because her temporary workers' compensation payments had been cut off and she desperately needed the money.

Although DeMark's testimony largely indicated that he deemed the carrier job unsuitable, notes he took while monitoring Wiggins' progress indicate that both Wiggins and Newport reported to him on multiple occasions during the late summer and early fall of 1997 that Wiggins was progressing well and experiencing "no problems" in her new position. J.A. at 260. On February 10, 1998, however, Dr. Stiles noted that Wiggins was "having a marked amount of difficulty with her left knee," *id.* at 121, and that the carrier job was causing her "a lot of pain in her knee." *Id.* Dr. Stiles thus prescribed medication and a knee brace to ease Wiggins' pain and stabilize her knee.

B.

While still employed as a paper carrier, Wiggins filed a claim seeking benefits under the Act for permanent total disability. *See* 33

U.S.C.A. § 908(a) (West 1986 & Supp. 2000). Newport opposed her claim, contending that Wiggins' job established the availability of "suitable alternate employment," thereby rendering an award of total disability improper. Newport also identified numerous additional jobs it claimed established a wage-earning capacity on Wiggins' part.

The ALJ found that none of the positions Newport had identified were suitable, based on Wiggins' physical or mental limitations, or on the distance of the required commute. The ALJ also concluded that Wiggins' carrier job did not constitute suitable alternate employment, reasoning that Wiggins required "undue help" from family members in re-rolling newspapers for delivery. The ALJ thus determined that the wages Wiggins earned from her new job did not establish a "wage-earning capacity," and that because Newport had failed to meet its burden to show that any other suitable employment existed, Wiggins qualified for total disability benefits. In denying Newport's motion for reconsideration, the ALJ specifically found, inter alia, that DeMark had never approved the carrier job, and that Dr. Stiles had not been fully informed that Wiggins would be required to re-roll large numbers of newspapers when he approved the position.

On appeal, the Board affirmed the ALJ's holding that Newport had failed to demonstrate that the newspaper job was suitable. Although it agreed with Newport that the ALJ's finding of "undue help" was unsupported by the record, the Board found that the ALJ's ultimate conclusion that the job did not establish a continuing ability to earn wages nonetheless was rational and supported by substantial evidence. The Board noted, for example, the existence of evidence demonstrating that re-rolling the papers aggravated Wiggins' hands, that she experienced "a lot" of knee pain at times, and that it took "extra effort" for her to discharge her job responsibilities. The Board also noted that Wiggins essentially was otherwise unemployable. The Board denied Newport's motion for reconsideration on October 25, 2000, and it is from this final order that Newport now appeals.

II.

This Court reviews the Board's decision for errors of law and to determine whether the Board adhered to its statutorily-mandated standard for reviewing the ALJ's factual findings. *Newport News Ship-*

*building & Dry Dock Co. v. Tann*, 841 F.2d 540, 543 (4th Cir. 1988). Under the Act, a compensation order must be supported by "substantial evidence in the record considered as a whole." 33 U.S.C.A. § 921(b)(3); *see also O'Keeffe v. Smith, Hinchman & Grylls Associates*, 380 U.S. 359, 362 (1965) (findings of ALJ must be accepted unless they are irrational or unsupported by substantial evidence in record considered as a whole). Substantial evidence has been described as "more than a scintilla but less than a preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 380 (4th Cir. 1994) (citations omitted).

### III.

Where, as here, an individual seeking total disability benefits under the Act establishes a prima facie case by demonstrating an inability to perform her former employment because of a work-related injury,[3] the burden shifts to the employer to establish the availability of "suitable alternate employment" that the claimant is capable of performing given her age, education, physical restrictions, and vocational background. *Lentz v. Cottman Co.*, 852 F.2d 129, 131 (4th Cir. 1988). A disability determination turns on the claimant's capacity for work rather than her actual employment status. *Tann*, 841 F.2d at 543. Consequently, a claimant may still be entitled to permanent and total disability benefits following a period of employment. *See*, *e.g.*, *Haughton Elevator Co. v. Lewis*, 572 F.2d 447 (4th Cir. 1978) (claimant worked in spite of excruciating pain); *Paul v. General Dynamics Corp.*, 13 BRBS 1073 (1981) (claimant's employment only possible due to extraordinary effort); *Walker v. Pacific Architects & Engineers Inc.*, 1 BRBS 145 (1974) (claimant's employment due merely to employer's benevolence). Although such an award is the exception rather than the rule, *Everett v. Newport News Shipbuilding & Dry Dock Co.*, 23 BRBS 316, 319 (1989), the burden to establish the existence of suitable alternate employment remains with the employer. *See Ramirez v. Sea-Land Services, Inc.*, 33 BRBS 41, 45 (1999).

---

[3]It is undisputed that Wiggins met her initial burden to establish a prima facie case.

The question is whether the Board erred in holding that substantial evidence existed to support the ALJ's conclusion that Wiggins' newspaper carrier job did not establish a continuing ability to earn wages, and thus did not constitute "suitable alternate employment" for purposes of determining her entitlement to an award of permanent total benefits. We agree with the Board that the ALJ's decision was rational and supported by substantial evidence.

As noted above, Wiggins testified that she often endured pain and was forced to stop working while re-rolling and delivering newspapers, particularly in cold weather. She specifically testified that she oftentimes was forced to rest after walking several blocks to avoid swelling and a burning sensation in her knee, and to keep her knee from giving way. She additionally noted that her hand would sometimes "lock" when re-rolling the newspapers, causing pain to shoot up to her shoulder.

This evidence clearly demonstrates that Wiggins worked in spite of considerable pain and discomfort, and strongly supports the conclusion that her ability to discharge her duties was due not to the suitability of the job, but rather to her extraordinary effort and perseverence. Employment performed under these circumstances does not fairly establish a continuing ability to earn wages, and thus does not constitute suitable alternate employment. *See Cooper v. Offshore Pipelines Int'l, Inc.*, 33 BRBS 46 (1999) (no wage-earning capacity shown where claimant worked in odd jobs beyond his physical limitations and medical restrictions, and in spite of pain and discomfort); *Mijangos v. Avondale Shipyards, Inc.*, 948 F.2d 941 (5th Cir. 1992) (employment unsuitable where claimant endures pain consistently); *Paul v. General Dynamics Corp.*, 13 BRBS 1073 (1981) (employment unsuitable where claimant experienced difficulty, and thus exhibited extraordinary effort, in getting to and from work and around his work station).

The opinions of Dr. Stiles and DeMark clearly corroborate the view that Wiggins' carrier job required unusual effort and failed to serve as a fair indication of her true ability to earn wages on a continuing basis. As described above, Dr. Stiles noted that the job caused "a lot" of knee pain, causing him to prescribe pain medication and a knee brace. DeMark more directly opined that the job exceeded both

Wiggins' medical restrictions and physical limitations. He further testified that Wiggins was forced to expend "extra effort" while enduring pain and difficulty in order to perform her job, that she only did so because her compensation had been terminated and she needed the money, and that her job established no continuing wage-earning capacity.[4]

We additionally note that it was reasonable for the Board to find, as it apparently did, that the carrier job violated at least some of the conditions and restrictions Dr. Stiles placed on Wiggins' employment. As stated above, Dr. Stiles conditioned his approval of the carrier job on the absence of "excessive walking." We have no trouble concluding that substantial evidence existed to support the conclusion that Wiggins' delivery of 200 newspapers per day, largely on foot, involved walking that was "excessive" for a person of her physical abilities.

The same is true of the permanent restrictions pertaining to the use of Wiggins' hands. The evidence fairly supports, for example, the conclusion that Wiggins' job, which involved transporting 200 newspapers from the *News-Herald* office to her residence; re-rolling the papers for delivery; re-loading them into her car; and delivering them to individual homes, transgressed a restriction on "firm grasping" which theoretically could have been violated on any day in which Wiggins engaged in more than one hour of such activity.

In sum, the evidence indicates that Wiggins worked in considerable pain and discomfort; her treating physician indicated that she suffered from undue pain; her rehabilitation counselor expressed a clear opinion that the job exceeded her physical limitations; and it appears that the job caused Wiggins to violate at least some of the medical restrictions placed upon her. Upon a review of the record as a whole, then, it is clear that more than a scintilla of evidence supported the ALJ's conclusion that Newport failed to meet its burden to show that Wiggins' part-time employment established a continuing ability to earn wages. Even if the evidence could fairly support a contrary finding,

---

[4]In addition, the fact that neither Dr. Stiles nor DeMark approved the position with full knowledge of its demands severely weakens Newport's argument that the approval itself demonstrates that the job was suitable.

we would nonetheless defer to the ALJ's findings, which are rational and supported by substantial evidence. *O'Keeffe*, 380 U.S. at 362; *See*, 36 F.3d at 380.

## IV.

For the foregoing reasons, the ALJ's order and the Board's affirmance are hereby affirmed.

*AFFIRMED*