United States Court of Appeals,

Fifth Circuit.

No. 91–4303.

AVONDALE SHIPYARDS, INC., Petitioner,

v.

RONALD J. GUIDRY and Director, Office of Workers Compensation Programs, Respondents.

Aug. 6, 1992.

Petition for Review of a Decision and Order of the Benefits Review Board United States Department of Labor

Before BRIGHT,[1] JOLLY, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

At issue is permanent partial disability "wage earning capacity", 33 U.S.C. § 908(h), for purposes of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.* Because the Administrative Law Judge (ALJ) and Benefits Review Board (BRB) applied a standard more stringent than that utilized in this circuit, we VACATE and REMAND.

I.

In July 1979, Ronald J. Guidry injured his neck while working as a scientific instrument mechanic for Avondale Shipyards, Inc. He did not reach maximum medical improvement until December 1984.[2]

Guidry's duties at Avondale involved calibrating electronic, pneumatic, thermal, and hydraulic sensing and measuring devices. Because Guidry could not return to his prior work, the Department of Labor used a job placement program. Guidry followed up on all the private sector job leads

---

[1]Senior Circuit Judge of the Eighth Circuit, sitting by designation.

[2]As Guidry was boarding a ship on which he had an assignment, he stumbled, "turned [his] head to the right, [and] felt something pop in the back of [his] neck". He was initially diagnosed as having cervical radiculopathy with nerve root irritation. After prolonged conservative treatment, Guidry underwent two anterior cervical fusions in 1981 and 1983.

suggested by his vocational counselor; but his counselor felt that Guidry was not a "self-starter" and was limiting his options. In April 1985, four months after attaining maximum medical improvement, he obtained a job with the University of New Orleans as a Scientific Instrument Technician II, a position he held at the time of the hearing (September 1986) before the ALJ. His starting, temporary salary of $8.23 an hour was reduced to $6.77 after he was hired permanently, several months later; it was $7.11 as of the hearing.

Guidry claimed benefits under the LHWCA, premised on a loss of wage-earning capacity as a result of his injury. Before the hearing, the parties stipulated to Guidry's average weekly wage at the time of his injury in 1979.[3]

At the hearing, Guidry established that he was partially disabled. For example, he was restricted from lifting more than 20 pounds, from pushing and pulling, and from reaching above the shoulder. Dr. Feldbaum, a certified rehabilitation counselor, vocational evaluation specialist and licensed psychologist, testified for Avondale that Guidry was capable of performing a number of electronics jobs available in the New Orleans area that paid wages higher than Guidry was earning. Dr. Feldbaum could not testify as to any specific, current openings in these fields and stated that of the approximately 12 employers he spoke to, only one had an opening at that time. As of the hearing, that job paid $6.00 to $9.00 per hour; Guidry's hourly wage of $7.11 fell within this range. Guidry testified that, although he thought the University job was more accommodating than the private sector to his restrictions, he "had no preference".

The ALJ determined that Guidry suffered from a temporary total disability between his injury in 1979 and reaching maximum medical improvement in December 1984; a permanent total disability

---

[3]At the hearing, however, Avondale sought to withdraw from the stipulation and introduce evidence of lesser earnings. This evidence was a computer printout that Avondale uncovered the day of the hearing. The ALJ refused to allow Avondale to withdraw from the stipulation and would not even permit an offer of proof. *See* note 12, *infra.*

from January 1985 until securing his University job in April 1985; and a permanent partial disability from that April. He concluded that Guidry's actual wages "fairly represent[ed] his wage-earning capacity"; that Avondale had "not met its burden" of showing otherwise; and that Guidry had sustained a loss of weekly earnings capacity of $127.61, resulting in weekly benefits of $85.07.[4]

Avondale turned to the BRB; more than four years later, it affirmed. It held, *inter alia,* that the ALJ's "conclusion" that Avondale failed to "establish the existence of *actual* job openings which [Guidry] could potentially fill is rational and in accordance with law"; and that the ALJ's "determination" that Avondale "failed to establish that [Guidry's] post-injury actual earnings do not reasonably reflect his post-injury wage-earning capacity[ ] is rational and supported by substantial evidence." (Emphasis added.)

## II.

Under the LHWCA, " "[d]isability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment...." 33 U.S.C. § 902(10). It may be either (1) total, either permanent, § 908(a), or temporary, § 908(b); or (2) partial, either permanent, § 908(c), or temporary, § 908(e). *See New Orleans (Gulfwide) Stevedores v. Turner,* 661 F.2d 1031, 1037 (5th Cir. Unit A 1981).

It is undisputed that Guidry is permanently, partially disabled; but, as discussed *infra,* this does not mean that he suffers from a permanent partial "disability", as defined by the LHWCA. For a "permanent partial disability", the LHWCA provides for compensation through either (1) a statutory schedule, which fixes payments based on the type injury, such as loss of an eye, and regardless of the claimant's earning capacity, § 908(c)(1)–(20); or (2), for "other cases", the loss in wage-earning

---

[4]As discussed *infra,* the LHWCA compensation is 662/3% of the loss. 33 U.S.C. § 908(c)(21).

capacity, § 908(c)(21).[5] For the latter, "the compensation shall be 662/3 per centum of the difference between the average weekly wages of the employee [at the time of injury] and the employee's *wage-earning capacity* thereafter in the same employment or otherwise, payable during the continuance of partial disability." § 908(c)(21) (emphasis added). Section 908(h) defines such wage-earning capacity:

> The wage-earning capacity of an injured employee in cases of partial disability under subsection (c)(21) of this section ... shall be determined by his actual earnings *if such actual earnings fairly and reasonably represent his wage-earning capacity: Provided, however, That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable,* having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

33 U.S.C. § 908(h) (underlining added). *See also Penrod Drilling Co. v. Johnson,* 905 F.2d 84, 87 (5th Cir.1990).[6]

## A.

"We review decisions of the BRB for errors of law and adhere to the substantial evidence standard that governs the BRB's review of the ALJ's factual determinations. Thus, the BRB's decision must be affirmed if it correctly concluded that the ALJ's findings are supported by substantial

---

[5]The two types are mutually exclusive and the claimant may not elect between them. *See Potomac Elec. Power Co. v. Director, Office of Workers Compensation,* 449 U.S. 268, 274, 101 S.Ct. 509, 512, 66 L.Ed.2d 446 (1980). Therefore, when a claimant is entitled to receive compensation pursuant to the statutory schedule, he may not choose to receive it pursuant to a loss in wage-earning capacity. *Id.*

[6]The LHWCA also provides for modification of an order awarding compensation "on the ground of a change in conditions". 33 U.S.C. § 922. The BRB and the Fourth Circuit have recognized that a change in wage-earning capacity, without a change in the claimant's physical condition, is a basis for modification. *See Fleetwood v. Newport News Shipbuilding & Dry Dock,* 776 F.2d 1225, 1228 (4th Cir.1985); *Blake v. Ceres Inc.,* 19 Ben.Rev.Bd.Serv. (MB) 219, 221 (1987). Therefore, if a claimant's wage-earning capacity increases to a rate higher than his pre-injury wages, the employer may request a modification on the basis that there is no longer a loss in wage-earning capacity. This interpretation of the statute is "in keeping with the purpose of the Act, which is to compensate workers for injuries that affect their wage-earning *capacities.*" *Fleetwood,* 776 F.2d at 1228–29 (emphasis in original).

evidence and are in accordance with the law." *P & M Crane Co. v. Hayes,* 930 F.2d 424, 428 (5th Cir.1991) (citations omitted). Moreover, the Act should be construed liberally in favor of injured employees. *See Turner,* 661 F.2d at 1038.

Pursuant to § 908(h), Avondale contends that Guidry's post-injury "actual earnings" from his University job do not "fairly and reasonably represent his wage-earning capacity"; he could perform a job with a higher salary. The BRB has held that "[t]he party seeking to prove that actual post-injury wages are not representative has the burden of proof on that issue." *Burch v. Superior Oil Co.,* 15 Ben.Rev.Bd.Serv. (MB) 423, 427 (1983); *Bolduc v. General Dynamics Corp.,* 9 Ben.Rev.Bd.Serv. (MB) 851, 853 (1979). *See P & M Crane,* 930 F.2d at 430. Avondale maintains that the ALJ and BRB applied the wrong legal standard to its burden of proof.

Avondale attempted to meet this burden by fulfilling the two-prong test of job availability enunciated for this circuit in *Turner:*

> (1) Considering claimant's age, background, etc., what can the claimant physically and mentally do following his injury, that is, *what types of jobs is he capable of performing or capable of being trained to do?*
>
> (2) Within this category of jobs that the claimant is reasonably capable of performing, *are there jobs reasonably available in the community for which the claimant is able to compete and which he could realistically and likely secure?* This second question in effect requires a determination of whether there exists a reasonable likelihood, given the claimant's age, education, and vocational background that he would be hired if he diligently sought the job.

*P & M Crane,* 930 F.2d at 430 (emphasis added in *P & M Crane* ) (quoting *Turner,* 661 F.2d at 1042). If the employer meets this burden, the claimant may still establish disability by demonstrating that he "diligently tried, [but was] unable, to secure such [alternative] employment." *Id.*

As noted, Avondale asserts that the ALJ and BRB applied the wrong legal standard. According to Avondale, the ALJ and BRB, even though citing *Turner,* in effect used the Ninth Circuit test that requires an employer to "point to *specific* jobs that the claimant can perform." *Bumble Bee*

*Seafoods v. Director, Office of Workers' Compensation,* 629 F.2d 1327, 1330 (9th Cir.1980) (emphasis in original).[7]  In *Turner,* this court explicitly rejected that test, stating that an employer is not required to become an employment agency for the employee, or indicate "actual job offers".  661 F.2d at 1041.

In ruling, the ALJ stated that Dr. Feldbaum, after a one-hour interview with Guidry, had

> merely describe[d] speculative potential jobs as opposed to realistic job opportunities actually available to [Guidry].  Although the law does not require that the Employer actually find some other employment for the Claimant, *the Employer must present actual and not theoretical opportunities*
>
> .... Because [Guidry] and his assisting vocational specialist ... stated that [his] efforts to find employment in the electronics industry in the private sector had been futile, [Avondale] has not met its burden with respect to suitable alternate employment.  Merely demonstrating categories of jobs that [Guidry] could reasonably perform does not demonstrate their availability.
>
> .... Moreover, [Avondale's] assertion that there is currently a similar job opening is insufficient since [Avondale's] manager testified that the position was never offered to [Guidry], nor even disclosed to [Guidry] until the day of trial.

(Emphasis added.)  (Citations omitted.)  Therefore, the ALJ held that Avondale had not established the *availability* of alternative jobs that Guidry could have secured if he had diligently tried.  The ALJ stated that, instead, it had only demonstrated a category of jobs that Guidry could have performed; it met only the first of the two prongs of the *Turner* test.  Because Avondale failed to meet its burden of showing availability, the ALJ found that Avondale did not show that Guidry's actual wages in his University job did not reasonably reflect his wage-earning ability.  In affirming, the BRB stated that it "has consistently held that while an employer need not actually obtain a job for the injured employee, *it must nevertheless establish the existence of actual, not theoretical, job openings.*"  (Emphasis added.)

We conclude that the ALJ and BRB applied a more stringent standard than *Turner.*  The ALJ

---

[7]The ALJ was visiting from the Ninth Circuit.

stated that Dr. Feldbaum testified only to a range of jobs but could not point to current openings when questioned about availability. Further, according to the ALJ, Dr. Feldbaum testified that finding "specific openings had not been his objective".

The testimony to which the ALJ is referring occurred during Guidry's cross-examination of Dr. Feldbaum. Guidry's counsel asked Dr. Feldbaum if any of the approximately 12 employers he had contacted for his market survey had current openings;  he replied that only one did.[8]  Counsel continued to go through each of the employers to establish that they did not have jobs available then. Dr. Feldbaum reiterated that he had not contacted these employers in order to obtain job *placement* for Guidry, who was employed;  he was checking on wages, job descriptions, and willingness to accommodate employees with Guidry's physical limitations.

Under *Turner,* and *P & M Crane,* an employer does not need "to provide evidence of ... *specific* job openings....  [A]n employer simply may demonstrate the availability of *general job openings* in certain fields in the surrounding community." *P & M Crane,* 930 F.2d at 431 (emphasis added).

*P & M Crane,* decided one month after the BRB's decision in this case, involved two permanently, totally disabled claimants.  In each case, the employers provided evidence of one specific job opening;  in one, the employer also provided general information on job availability.  The ALJ and BRB held that such evidence was insufficient to "establish the availability of suitable alternative employment". *Id.* at 428.

We vacated and remanded, holding that the ALJ and BRB had misapplied a Fourth Circuit case, *Lentz v. Cottman Co.,* 852 F.2d 129 (4th Cir.1988), and *Turner,* "to the extent that the BRB

---

[8]As noted, Guidry's University job wages fell within the hourly wage range of this opening, assembling hearing aids;  the wages ranged $6—$9, Guidry earned $7.11.

decided that the employers ... were required to provide evidence of *more specific job openings.*" *Id.* at 431 (emphasis added). In our analysis we reaffirmed *Turner,* its two-prong test, and its underlying, salutary purpose—to prevent the employer from becoming an employment agency, which "would provide a claimant with little incentive to seek rehabilitation or job retraining." *Id.*[9]

Dr. Feldbaum testified that he had checked newspapers from June to September 1986 and that there were openings for the types of job categories he had described earlier in his testimony. These jobs included benchwork on small products, such as walkie-talkies, radio transmitters, hearing aids, pocket pagers, and tape recorders, that weighed less than 20 pounds. (As noted, Guidry testified that he could not lift more than this.) Moreover, he testified that, within three months, he could place Guidry in a job which would pay more than his University job. (The delay was a result of Dr. Feldbaum's schedule, not Guidry or the job market.)

By requiring Avondale to present actual or specific job openings, the ALJ required more than necessary under § 908(h). This is the message from *Turner,* resoundingly affirmed in *P & M Crane.* At issue under § 908(h) is "wage-earning capacity"; whether Guidry's "actual earnings do not *fairly and reasonably* represent his wage-earning capacity". 33 U.S.C. § 908(h) (emphasis added). Dr. Feldbaum described the types of jobs Guidry could perform, given his age, background, physical injury, etc. (the first part of the *Turner* test), and gave his opinion on the availability of these jobs, based on newspaper ads and telephone calls (the second part). He testified consistently that Guidry could obtain a higher paying job:

> A: ... [I]f he would like to get into a line other than state civil service, maybe he could progress a little bit better.
>
> * * * * * *

---

[9]We also disagreed with the holding of *Lentz;* an employer *may* be able to satisfy its alternative employment burden with evidence of one available job, especially if the job requires specialized skill which the claimant possesses. 930 F.2d at 431.

A: ... I believe that if the gentleman would like to get into a different area ... I believe he could be placed.

\* \* \* \* \* \*

A: ... I have checked newspapers ... [and] there are current openings for [small] products....

\* \* \* \* \* \*

A: ... [W]hen he wants to shift ... I think there is a viable option for him.

\* \* \* \* \* \*

Q: Based on this gentleman's current physical limitations and his current skills and training, are there positions now available where they would get him at this time a wage greater than that which he is making at the University of New Orleans?

A: Yes, sir.

The ALJ stated that "[m]erely demonstrating categories of jobs that [Guidry] could reasonably perform does not demonstrate their availability." But, Dr. Feldbaum did far more than that. The ALJ, for proper reasons, may reject Dr. Feldbaum's testimony in making his factual findings, but he may not do so by applying an incorrect legal standard. Dr. Feldbaum did testify as to the *general* availability of openings. The ALJ, and the BRB, applied too stringent a standard to Avondale, requiring it to locate "actual" job openings.[10] That standard is at odds with the plain meaning of § 908(h) and has been specifically rejected by this court. *See P & M Crane,* 930 F.2d at 431.[11]

---

[10]As noted, the BRB stated that Avondale "must nevertheless establish the existence of actual, not theoretical, job openings."

[11]The Director of the Office of Workers' Compensation Programs (Director) contends primarily that Dr. Feldbaum did not provide evidence of job openings during the "critical time" between Guidry's reaching maximum medical improvement (December 1984) and obtaining employment (April 1985). He asserts that Dr. Feldbaum's testimony as to availability in 1986, 17 months after Guidry obtained a job, is insufficient under *Turner.* Neither the ALJ, nor the BRB, addressed this issue.

Notwithstanding the deference given the Director in his interpretation of the LHWCA, we disagree with the position he urges here. When a claimant has obtained employment, the critical time is "after an employee's maximum health potential has been demonstrated." *P & M Crane,* 930 F.2d at 430–31 n. 11. This reasoning comports with the statute's modification policy. 33 U.S.C. § 922. See note 6, *supra.* It is more efficient to allow the employer to show that job availability exists around the time of the hearing, but possibly after the claimant obtained employment, than it is to limit the critical period to an earlier period, probably not representative of the job market as of the hearing, and then

B.

Guidry's injury occurred 13 years ago; and, since July 1985, the parties have contested his wage-earning capacity. The ALJ ruled in November 1986; *four years and four months* later, in March 1991, the BRB affirmed. Needless to say, it would more than serve the interests of justice and the parties to resolve this issue—and, therefore, end this case—here and now. This notwithstanding, because the factual findings are based on an incorrect interpretation of the law, we must, most reluctantly, remand this case for further proceedings consistent with this opinion. *See, e.g., P & M Crane,* 930 F.2d at 431; *Turner,* 661 F.2d at 1033.[12] Modification, if any, of the compensation previously awarded Guidry will be prospective only.

III.

Accordingly, we VACATE the order of the BRB and REMAND for further proceedings consistent with this opinion.

E. GRADY JOLLY, concurring and dissenting:

In concurring, I would first point out that both the cases of *Turner* and *P & M Crane* involved claimants who contended that they were permanently and *totally* disabled. Consequently, the test and the analysis applied in those cases to determine disability are not in all respects applicable in determining the disability of Guidry, who only claims to be *partially* disabled. The *Turner,* and *P & M Crane* tests are applied to determine "whether or not," whereas our determination here is "how much." Although *Turner* and *P & M Crane* are clearly precedent to the extent that they are relevant, we are not constrained to force the "square" facts of this case into the "round" analysis of those cases,

require the employer to request a modification of an award the day after it is granted.

[12]On remand, and if additional evidence is received, Avondale may again seek the admission of evidence, previously stipulated, on Guidry's average weekly wage with Avondale. The ALJ did not commit reversible error in holding Avondale to its stipulation; but, at the very least, the offer of proof should have been permitted. *See* note 3, *supra.* Obviously, on remand, the bases for upholding the stipulation at the hearing in 1986 may no longer apply.

but instead should apply those precedents only to the extent that their analyses and holdings fit the case with which we are confronted today.

Further, I would emphasize that the *ultimate* question for the factfinder in this case is solely whether Guidry's admitted permanent partial disability affects his wage-earning capacity in the relevant employment market, and if so to what extent. In order to stay focused on this question, it is important to recognize what the ultimate question is *not.* It is *not* what Guidry's wage was at the time that he reached maximum medical recovery, nor the effect of that wage having been subsequently reduced, nor whether there are certain tradeoff benefits in a civil service job that must be taken into account, nor what rate he could have earned in a different job at the time that he reached maximum medical recovery, nor what rate he could earn in a different job tomorrow, or next month, or even in the next six months, nor whether he diligently sought such a job; although relevant considerations, each is only secondary to the ultimate issue for determination.

In particular, the ultimate question is not whether there are jobs in the relevant market that are presently available. For example, if the evidence shows a general unavailability of relevant jobs, the evidence might also show it was caused by a temporary downturn in the economy. Such an explanation for job unavailability, if accepted, would consequently not be probative of Guidry's contention that his injury was the reason for his failure to secure a higher paying job. After all, it is important in assessing Guidry's disability to remember that we are dealing with Guidry's right to disability compensation, not his right to unemployment supplemental benefits or his right to permanent employment at the Avondale rate of pay. Indeed, the very fact that there are higher paying jobs in the market—although presently filled—that Guidry is qualified to perform is powerful evidence that *his permanent partial disability* has resulted in *no* loss of wage-earning capacity. In short, the unavailability of a higher paying job to Guidry must be causally related to his injury, not to the market, personal choice, or other factors. On the other hand, on the proper record evidence, the factfinder may well find that it is relevant, in determining whether Guidry's injury has damaged his

earning capacity, that Guidry's disability has reduced the number of jobs available to him.

In concurring, I hope my point is clear that the factfinder cannot be placed in the straitjacket of a one-two-three type of analysis, but instead, the factfinder must consider and analyze the totality of the evidence. The more important point I am emphasizing, however, is that each of the inquiries—into Guidry's wage-earning history, the value to be attached to non-economic benefits of his present work, his diligence in seeking other jobs, the current conditions of the labor market, defining the relevant labor market, and so on—are merely secondary to the ultimate inquiry on which the factfinder must cast his primary focus: has Guidry's capacity to earn wages been affected *by his permanent partial disability?*

Finally, I feel it necessary to comment on footnote 11. As I have noted earlier, *Turner* and *P & M Crane* do not in all respects fit this case, because in those cases the court was discussing the analysis applicable in determining whether a claimant is permanently and totally disabled. Consequently, when those cases speak of the "critical time" in determining whether a disability exists, we should not be misled or confused by the comments in those cases that are inapplicable to a determination of the degree to which an injury has affected, and continues to affect, the amount of money a claimant can earn. Common reasoning surely tells us that before we can determine the "critical time," we must know the "critical question." Here, for example, if the critical question is Avondale's liability for disability at the time Guidry reached maximum medical recovery, then obviously, the "critical time" of the inquiry is the time that Guidry reached maximum medical recovery. On the other hand, if Avondale is alternatively seeking modification of the award, contending that it has no future liability, or perhaps that its future liability is in a lesser amount than it is presently paying, the "critical time" for that inquiry would be at the time of the hearing.

At least as I understand this case, both the time that Guidry reached maximum medical recovery and the time of the hearing are critical times, each for a different purpose. Indeed, on

remand there may be a third critical time—the time of the remand hearing. In sum, Avondale may wish to demonstrate that Guidry suffered no loss of earning capacity either at the time of his maximum medical recovery, or at the time of the first hearing, or at the time of the remand hearing. Its liability would be reduced or eliminated at whichever point it first proved no loss of wage-earning capacity.

Consequently, to the extent that footnote 11 suggests that because "it is more efficient," an employer can defend its liability during the entire disability period by introducing evidence relevant to only one part of that period, I respectfully dissent.