**Michael D. WOOD, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF LABOR, Bath Iron Works Corporation, Respondents.**

No. 96–2055.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1997.

Decided May 8, 1997.

---

Gary A. Gabree, Bath, ME, with whom Stinson, Lupton, Weiss & Gabree, P.A., was on brief, for petitioner.

Richard F. van Antwerp, Portland, ME, with whom Thomas R. Kelly and Robinson, Kriger & McCallum, were on brief, for respondents.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOUDIN, Circuit Judge.

The dispute in this case concerns Michael Wood's claim for partial disability payments from his former employer, Bath Iron Works, Inc. ("Bath"). His benefits were terminated on the ground that Wood had been offered his pre-injury wages and more by Bath in a new capacity at Bath's shipyard in Bath, Maine, but had declined the job offer because he had relocated to another state. The problem posed is obvious; the solution is not.

The underlying facts are largely undisputed. Starting in January 1988, Wood worked as an insulator at the Bath, Maine shipyard, installing fiberglass and polyamide foam materials. In October 1988, he developed breathing and sinus problems, and a skin rash, apparently as a result of exposure to dusts and fumes in his job at Bath. Bath kept him on in a position that did not involve contact with these materials until December 1988, when Wood was terminated.

In May 1989, Wood filed a claim with the Department of Labor's Office of Workers' Compensation Programs ("OWCP") seeking disability benefits under the Longshore and Harbor Workers' Compensation Act ("the Act"), 33 U.S.C. §§ 901–950. That statute creates a familiar statutory scheme for no-fault compensation, financed by the employer, where the employee suffers a job-related disability. In February 1990, before the claim was resolved, Wood returned to Bath as a delivery truck driver.

In March 1991, an Administrative Law Judge in the Labor Department awarded Wood total disability payments for two days in December 1988, immediately following his dismissal from Bath, 33 U.S.C. § 908(a), and partial disability payments for about two

months thereafter based on the difference between the $356 weekly pay Woods had earned as an insulator at Bath and his actual wages earned thereafter (working for other employers). 33 U.S.C. § 908(c)(21). Because the new job Wood took with Bath as a delivery driver in February 1990 paid more than his old insulator wages, he was awarded no disability benefits after his reemployment date.

In August 1991, Wood was laid off by Bath, due in part to his lack of seniority. In October 1991, having been advised by Bath's personnel office that his layoff was "permanent," and having found no other suitable job in Bath, Wood moved to Shortsville, New York, the town in the western part of that state where he had grown up and where his immediate family still lived.

With his brothers' help, Wood landed a series of auto mechanic jobs, making $300–315 weekly on a fairly steady basis from November 1991 through at least April 1993.

During this period in Shortsville, Wood was twice offered reemployment by Bath. In March 1992, Bath contacted Wood to offer him a position similar to the delivery driver job he had held earlier. But when Wood went to Maine for a physical examination, he discovered that the recall was a mistake, caused by a Bath hiring employee's mistaken reliance on job type seniority rather than overall union seniority.

In February 1993, Bath recalled Wood a second time, but he failed to report to Bath for a scheduled physical. Although Bath repeated the offer several times, Wood declined, apparently for several reasons: an inability to relocate soon enough to report for work in March, as Bath required; the fact that the job was only "guaranteed" for 30 days; and Wood's increasing ties to Shortsville, including care of his then-hospitalized mother. As a result, Bath terminated Wood's seniority-based rights to future employment pursuant to the union contract.

In the meantime, Wood had renewed his claim for disability benefits. In August 1991, Wood sought new benefits for partial disability under 33 U.S.C. § 908(c)(21); the Act defines disability as "incapacity because of

injury to earn the wages which the employee was receiving at the time of injury." *Id.* § 902(10). Wood claimed that his Shortsville earnings accurately reflected his present earning capacity, *see id.* § 908(h), and asked that his earlier disability award be modified, as provided by 33 U.S.C. § 922, based on the gap between his pre-injury Bath insulator wages and his lower Shortsville earnings.

In October 1993, a different Administrative Law Judge rendered the decision that is now before us on appeal. As to the period between August 1991 and March 1993, the ALJ held that Bath had failed to show that Wood's actual earnings in Shortsville underrepresented his earning capacity. He ruled that Wood was therefore entitled to disability payments for that period based on the difference between the wages he had earned as a Bath insulator in 1988 and his lesser actual wages in Shortsville.

However, the ALJ also found that in February and March 1993 Bath had made Wood a *bona fide* reemployment job offer that would have paid more than Wood's pre-injury wage, and that Wood declined the offer for his own personal and family reasons. The ALJ held that the offer established that, from that time forward, Wood's earning capacity was not impaired as a result of his disability. Wood's testimony had made clear, said the ALJ, that Wood would not have accepted the Bath job even if it had been offered as a permanent one. Accordingly, Wood's partial disability benefits were cut off after that date.

In December 1993, Wood appealed the portion of the decision denying benefits after March 1993 to the Labor Department's Benefits Review Board, as allowed by 33 U.S.C. § 921(b). On September 12, 1996, the Review Board sent Wood a notice pursuant to Pub.L. 104–134, § 101(d), 110 Stat. 1321–219 (1996), stating that the decision was to be considered affirmed for purposes of appeal to this court. Wood filed a motion for reconsideration which the Review Board denied. He then filed a notice of appeal to this court pursuant to 33 U.S.C. § 921(c).

In reviewing such compensation decisions, this court normally accepts the ALJ's findings of fact where they are supported by

substantial evidence, and reviews legal questions *de novo*. *CNA Ins. Co. v. Legrow,* 935 F.2d 430, 433 (1st Cir.1991). The central issue in our case, however, does not neatly fit within these polar categories. Our main task here is to discern standards—an amalgam of law and policy—to cope with a recurring problem with many variations: how earning capacity should be calculated when the employee, after the injury, moves to a new community.

We begin with the Act. For some partial disabilities (*e.g.,* the loss of a finger), the Act schedules a payment, 33 U.S.C. §§ 908(c)(1)-(20), but for unscheduled injuries such as Wood's, the Act requires that the employee's reduced earning capacity be determined; the employer is then required to pay regularly two thirds of the difference between the employee's pre-injury wages and his post-injury reduced earning capacity. *Id.* §§ 908(c)(21), 908(e). Actual post-injury earnings are evidence of capacity but are not conclusive. *Id.* § 908(h).

◼ Wood's earnings in Shortsville were less than his pre-injury wages as a insulator at Bath. The employer has the burden of proving that the claimant's earning capacity is greater than his actual earnings. *Avondale Shipyards, Inc. v. Guidry,* 967 F.2d 1039, 1042–43 (5th Cir.1992). Here, Bath does not claim that Wood could have earned more in Shortsville; but it says that its own offer shows that he could have exceeded his own pre-injury wages in Bath. The ALJ so found, at least implicitly, and Wood does not directly dispute the finding.

But the statute itself does not tell us *where* earning capacity is to be measured. The closest it comes to addressing the issue at all—and it is not very close—is as follows:

The wage-earning capacity of an injured employee in cases of partial disability under subsection (c)(21) of this section or under subsection (e) of this section shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Provided, however,* That *if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy com-*

*missioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable,* having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future.

33 U.S.C. § 908(h) (emphasis added).

◼ This is a typical problem presented in an age of statutes; the Act's language does not squarely answer the question posed, and often enough Congress never gave a thought to the issue. Sometimes the responsible agency fills in such lacunae through regulation, but not so here. Even so, in the normal case, the agency's individual case decisions tend to mark out a pattern that deserves substantial deference, *see SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947), and the agency's application of general standards to specific facts is usually upheld if "reasonably defensible." *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 891, 104 S.Ct. 2803, 2808, 81 L.Ed.2d 732 (1984).

The problem of deference in our case is more complicated than it is under the ordinary regulatory statute. Administrative authority under the Act has been assumed by the Secretary of Labor, 33 U.S.C. § 939, delegated to an assistant secretary, and redelegated in turn to the director of the OWCP. 20 C.F.R. §§ 701.201–.203. But neither the Secretary nor the director reviews the decisions of the ALJs or the Review Board, which by statute are now reviewable only in the courts of appeal. 33 U.S.C. § 921(c).

Thus, contrary to the usual administrative scheme, it is unclear to what extent the ALJ and Review Board reflect the policymaker's viewpoint. Indeed, the Supreme Court has declared that "the Benefits Review Board is not a policymaking agency; its interpretation of the [Act] thus is not entitled to any special deference from the courts." *Potomac Elec. Power Co. v. Director, OWCP,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 515 n. 18, 66 L.Ed.2d

446 (1980); *see Director, OWCP v. General Dynamics Corp.,* 982 F.2d 790, 794–95 (2d Cir.1992) (deference due to OWCP but not Review Board); *see also Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 152–57, 111 S.Ct. 1171, 1176–79, 113 L.Ed.2d 117 (1991).

Against this background, we turn to the problem at hand, which is actually a multiplicity of problems. Moves by partly disabled employees are not uncommon, nor is it rare for them to move back to communities where family members can lend support. The disability payment itself creates an odd incentive for the former employee to seek out a lower cost community, knowing that lower wages in the area will be offset (although only in part) by the employer's continuing payment. A different incentive, and sometimes union agreements, encourage the original employer to persist in trying to rehire the employee where feasible.

And there are countless variations in the underlying circumstances: an employee may move for good reasons or bad; reasons may be economic or highly personal; a new job offer may require a move back or elsewhere, and may come from the old employer or a new one; and a refusal to move again may reflect any of these various reasons. Similarly, the financial impact on the claimant and the employer will vary greatly from case to case, depending in part on the difference in costs and wage rates in two communities.

Despite the Review Board's lack of policy authority, we would be sorely tempted to follow its lead if its decisions on the relocation issue scythed a clear and consistent path. Twelve circuit courts are no substitute for one coherent agency policy. But so far as we can discern, the Review Board tends to resolve these cases on their facts, with one major qualification: little if any weight is given to so-called "personal" reasons of the

employee for choosing to move or refusing to do so.[1]

The only circuit court precedent directly on point endorses an "on the facts" approach. *See v. Washington Metropolitan Area Transit Auth.,* 36 F.3d 375 (4th Cir.1994). There the court ruled:

> [T]he ALJ's determination of the relevant labor market should include consideration of such factors as the claimant's residence at the time of his filing for disability benefits, his motivation for relocation after the accident, the legitimacy of that motivation, the duration of his stay in that new community, his ties to that new community, the availability of suitable job opportunities in the new community as opposed to those in his former residence, and the degree of undue prejudice to the employer in proving suitable alternative employment in the claimant's new community.

*See,* 36 F.3d at 383. Notably, one recent Review Board decision has embraced *See*'s multifactor approach. *Wilson v. Crowley Maritime,* 30 B.R.B.S. (Bender) 199, 203–04 (1996).

The Department of Labor itself had argued in *See* that "a legitimately motivated postaccident relocation can create a new relevant labor market." *See,* 36 F.3d at 383. We have obtained the brief submitted by the Department in *See* and discovered that the Department also wrote in its brief:

> [C]onsideration should be afforded to such factors as whether the claimant has relocated for a proper purpose, or in an effort to frustrate an employer's ability to establish suitable alternative employment, and whether a finding that the relevant labor market is the community to which the claimant has relocated would unduly prejudice the employer.

Brief of the Respondent Director, OWCP at 22. The Department's litigating position is

---

1. *See Vasquez v. Continental Maritime,* 23 B.R.B.S. (Bender) 428, 430 (1990) (relocation to community with more limited job market due to marital problems); *Nguyen v. Ebbtide Fabricators, Inc.,* 19 B.R.B.S. (Bender) 142, 145 (1986) (claimant moved away from New Orleans to live with his grandmother); *Dixon v. John J. McMullen & Assocs.,* 19 B.R.B.S. (Bender) 243, 246–47 & n. 3 (1986) (employee, injured in Maine while

under a one year contract, returned to permanent Mississippi residence); *Elliott v. C & P Tel. Co.,* 16 B.R.B.S. (Bender) 89, 92 (1984) (claimant had been planning move due to husband's anticipated relocation); *see also McCullough v. Marathon LeTourneau Co.,* 22 B.R.B.S. (Bender) 359, 365–66 (1989) (claimant declined employer's job offer because he planned to move away).

not a binding administrative determination, 1 Davis & Pierce, *Administrative Law Treatise* § 3.5 (3d ed. 1994 & Supp.1995), but it is informative.

■ We are content to follow the lead of *See*, the Secretary's brief and the latest Review Board decision and also endorse an "on the facts" approach. But to provide some structure for analysis, we think that the employee's chosen community is presumptively the proper choice for determining earning capacity, and that the employer bears the burden of showing that the original move, or a refusal to move again, is unjustified. *Cf. Avondale Shipyards*, 967 F.2d at 1042–43. Of course, where knowledge about reasons is possessed only by the employee, his silence may be telling.

■ As to what constitutes justification, we agree that economic judgments ought generally to control. Care for an aged parent is to be commended; but a claimant who turns down a better job elsewhere for personal reasons has a much weaker claim to be subsidized by the employer. *See Nguyen*, 19 B.R.B.S. at 145. Some state courts may be more liberal;[2] but until Congress (or possibly the Secretary) decides otherwise, we think that the Review Board's economic emphasis is consistent with the Act's own goals of fair compensation and encouragement of work. *See New Orleans (Gulfwide) Stevedores v. Turner*, 661 F.2d 1031, 1042 (5th Cir.1981).

Even if the employee's reasons are economically sound, both *See* and the Secretary's brief suggest that in some cases the employer may still suffer undue "prejudice" if the disparity in wages between the new and old locations is extreme. Possibly, the statutory language of section 908(h), quoted above, is broad enough to permit some equitable adjustment (*e.g.*, pegging the earning capacity at some intermediate level).[3] However this may be, we accept that the "prejudice" concept may be a reasonable safeguard in extreme cases.

We turn finally to the decision of the ALJ in this case. While the ALJ may have no "policy" authority, deference is still ordinarily due to the frontline adjudicator in applying general standards to particular facts. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). This is a different kind of respect than deference to a policymaker. It is the deference ordinarily accorded by appeals courts to trial courts, based on their superior feel for the facts and the situation, even where the standards to be applied are well settled. *See, e.g., United States v. Cruz–Kuilan*, 75 F.3d 59, 61 (1st Cir.1996).

But despite this deference, the present decision needs to be reexamined. The ALJ in this case effectively adopted a legal rule that makes a *bona fide* higher-pay offer by the original employer almost conclusive even where it compels relocation back to the original job site. Indeed, the ALJ cited Review Board precedent for the view that any suitable job in the original location of injury could be used to cap the employee's disability benefits. *E.g., Nguyen*, 19 B.R.B.S. at 145. If this is the Review Board's view, we think that it goes too far.

As we have already said, it seems to us that the employee's community is presumptively the place for measuring his earning capacity, unless and until the employer shows that the move to the community was unreasonable, or that a refusal to move again is unreasonable, or that (reasonableness aside), the prejudice to the employer is just too severe. Bath has not claimed here that it was unreasonable for Wood to move to

---

**2.** *See, e.g., Hurley v. Stuart Fine Foods*, 687 So.2d 310, 311 (Fla.Dist.Ct.App.1997) (where claimant moved away to live with parents, benefits due absent evidence that the move was improperly motivated (*i.e.*, by a desire to avoid work)); *Kurrell v. National Con Rod, Inc.*, 322 N.W.2d 199, 202 (Minn.1982) (even if move was motivated by exclusively personal reasons, disability benefits due as long as claimant made an "earnest effort to return to the work force" in the new community).

**3.** Without advocating the use of intermediate adjustments (which would present obvious potential complications), we note that the language of section 908(h) does seem to allow significant latitude; and several courts, including this one, have concluded that it supports adjustments for inflation. *See, e.g., White v. Bath Iron Works Corp.*, 812 F.2d 33, 35 (1st Cir.1987).

Shortsville, and we are at least skeptical that the difference between Wood's insulator wages and his Shortsville income suggests severe prejudice to Bath.

Thus, the issue probably comes down to whether it was reasonable for Wood to refuse to move back to take the proffered job in Bath, while insisting on continued payments for partial disability. The ALJ thought not, primarily because he viewed Wood as having refused to move solely upon personal grounds. We agree that the personal grounds are not an excuse for refusing to take a better job. Still, it is not clear why Wood's personal motives should count against him if the job actually offered did not warrant a move back to Bath.

This comparison is primarily economic, as we gloss the Act, but the higher wages in Bath can hardly be conclusive. Here, it appears from the record that Wood was earning reasonably good wages in Shortsville with no apparent risk of layoff and with some prospect of promotion. Bath's offer of somewhat better pay at the old location, but apparently with minimal formal security as to tenure, was not on the surface plainly a better offer, even from a strictly economic standpoint.

This surface impression is open to correction. There is some record evidence, not mentioned by the ALJ, that the job offered by Bath was likely to endure longer than the 30–day guarantee (the test is what Wood knew, not what happened later). But other evidence, also not mentioned, indicates that Wood might have foregone promotion opportunities by moving. Possibly, under a standard of reasonableness, the ALJ might have decided the case either way. But that standard of reasonableness, and not some automatic right of the employer to require a move back, ought to govern until Congress or the Secretary says otherwise.

The *Chenery* doctrine—that the agency must be judged upon the grounds it has given—thus warrants a remand for further proceedings. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943). Wood's move to Shortsville has not been challenged. Thus, on remand the ALJ should treat Shortsville as presumptively the relevant community for determining Wood's earning capacity, unless and until Bath proves that his decision to remain there was unreasonable, taking account centrally of economic factors, or that this is the rare case of undue prejudice.

We intend no criticism of the ALJ who deemed himself bound by earlier Review Board precedent. If that precedent had been blessed by the Secretary, we might also defer; but the Secretary's position appears closer to that of *See*, and even the Review Board has now moved in that direction. These new developments, which post-date the ALJ's decision, reinforce our view that this case needs a fresh look. We do not say that it necessarily requires a different result.

The decision of the ALJ, affirmed by the Review Board through inaction, is *vacated* and the matter *remanded* for further proceedings consistent with the standards set forth in this opinion. Whether any further evidentiary hearing is required is a matter within the sound discretion of the ALJ. Each side shall bear its own costs on this appeal.

*It is so ordered.*