*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-1143

JUANITA CARDEN, PETITIONER,

V.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

ACADEMY EXPRESS, LLC, *et al*., INTERVENORS.

On Petition for Review of an Order
of the District of Columbia Department of Employment Services
(CRB-94-19)

(Submitted February 9, 2021                                        Decided July 1, 2021)

Juanita Carden filed a *pro se* brief.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, filed a statement for respondent in lieu of brief.

*Sheryl A. Tirocchi* was on the brief for intervenors.

Before GLICKMAN and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

THOMPSON, *Associate Judge*:   A District of Columbia Department of

Employment Services ("DOES") Administrative Law Judge ("ALJ") determined

(1) that petitioner, workers' compensation claimant Juanita Carden, did not voluntarily limit her income by failing to cooperate with vocational rehabilitation, and (2) that the relevant labor market for purposes of determining whether suitable employment is available to petitioner is the area where she returned to reside after her disabling injury (rather than the District of Columbia, where petitioner sustained her injury, or its environs). The DOES Compensation Review Board ("CRB") rejected those determinations and reversed the ALJ's Compensation Order ("CO") that had reinstated petitioner's partial wage-loss benefits. For the reasons that follow, we vacate the CRB's decision and remand.

## I.

On October 30, 2015, petitioner, a tour bus operator employed by the intervenor, injured her right shoulder while lifting heavy passenger baggage. The injury occurred in the District of Columbia while petitioner was loading luggage outside a hotel for a group headed to Dulles Airport. After her injury, petitioner underwent surgery and was given the post-operative restrictions of no climbing, no overhead reaching or lifting with the right arm, no lifting over ten pounds, and no repetitive use of the right arm. Accordingly, petitioner was no longer able to carry out her former job duties.

At the time of her injury, petitioner resided in a rented room in Fredericksburg, Virginia. Her bus driving took her as far as New York City, but she reported to work in Bristow, Virginia, her employer's base of operations. She testified at the July 24, 2019, hearing before the ALJ that in February 2016, the intervenor notified her that no light duty work was available to accommodate her limitations. Also, according to a statement by petitioner in one of the hearing exhibits, at some point the intervenor "stripped" her of medical benefits. Intervenor's counsel told the ALJ that the intervenor or its insurer made voluntary temporary total disability (TTD) payments to petitioner for the November 1, 2015, to August 27, 2017, period and temporary partial disability payments for the August 28, 2017, to September 8, 2018, period. Counsel did not state, however, and the record does not indicate, precisely when the payments were made.[1] Petitioner testified that in May 2016, without a job and unable to pay rent, she

---

[1] The Appendix to petitioner's pro se brief contains copies of checks and check stubs that appear not to be part of the agency record, but that appear to show that on December 14 and 15, 2016, — over four months after petitioner filed her claim for workers' compensation benefits — the intervenor made payments totaling $35,334.40 for the period from November 1, 2015, to December 27, 2016. Thus, the extra-record exhibits appear to show that the intervenor/insurer paid petitioner over a year's worth of temporary total disability payments only retroactively.

moved back to her hometown (her permanent place of residence) in Scottsburg, Virginia, about 200 miles away.

Petitioner eventually enrolled in a Virginia workforce development program and, on August 28, 2017, began working as an IT help desk technician for what was then Hewlett Packard Enterprises in Clarksville, Virginia. Petitioner's hourly wage at her new position resulted in an ongoing partial wage loss. As noted, intervenor paid her temporary partial disability benefits for some time, but eventually filed a Notice of Controversion indicating that it would discontinue benefit payments because of petitioner's failure to cooperate with vocational rehabilitation and voluntary limitation of income.[2]

A vocational rehabilitation counselor retained by intervenor first interviewed petitioner on April 24, 2018. From June 5, 2018, to August 7, 2018, the vocational counselor provided petitioner with "three sets of job leads" in the District of

---

[2] *See* D.C. Code §32-1507(d) (2019 Repl.) ("If . . . the employee unreasonably refuses. . . to accept vocational rehabilitation the Mayor shall, by order, suspend the payment of further compensation, medical payments, and health insurance coverage during such period, unless the circumstances justified the refusal."), and §32-1508(5) ("If the employee voluntarily limits his income or fails to accept employment commensurate with his abilities, then his wages after the employee had the disability shall be deemed to be the amount he would earn if he did not voluntarily limit his income or did accept employment commensurate with his abilities.").

Columbia or Northern Virginia. While the positions were approximately 200 miles away from petitioner's residence in Scottsburg, Virginia, they were similar to her current position in IT and paid as much or more than her wages at Hewlett Packard, with many paying more than petitioner's pre-injury average weekly wage. Petitioner told the vocational counselor that she did not want to move to the Washington, D.C. area because taking leave to interview with employers over four hours away might jeopardize her current position. Petitioner did not contact the potential employers or apply for the recommended positions. The intervenor therefore terminated petitioner's benefit payments.

The focus of the hearing before the ALJ was on whether petitioner had voluntarily limited her income by failing to cooperate with vocational rehabilitation, and whether the Washington, D.C. area is the relevant labor market for vocational opportunities. In the post-hearing CO, the ALJ acknowledged this court's holding in *Joyner v. District of Columbia Dep't of Emp. Servs.*, 502 A.2d 1027, 1029 (D.C. 1986) (upholding as reasonable DOES's interpretation that "the relevant labor market for determining the availability of suitable employment is the District of Columbia labor market rather than such other place a claimant may reside"). The ALJ emphasized, however, this court's concomitant statement in a footnote in *Joyner* that "[t]he Department would certainly consider such

circumstances [e.g., the circumstance of an injured claimant who was required for financial reasons to move to a distant location in order to be cared for by relatives] in determining whether a claimant had 'voluntarily' limited her income or failed to accept suitable employment." Compensation Order at 5 (quoting *Joyner*, 502 A.2d at 1030 n.3). Noting that this court in *Joyner* had also noted with approval DOES's reliance on interpretations regarding the relevant labor market in the analogous Longshoremen's and Harbor Worker's Compensation Act ("LHWCA"),[3] the ALJ took into account that in the years since *Joyner*, federal courts applying the LHWCA had concluded that the relevant labor market should be determined "after considering such facts as claimant's residence at the time he files for benefits, his motivation for relocating, the legitimacy of that motivation, the duration of his stay in the new community, and the availability of jobs in the new location as opposed to his former residence." The ALJ cited in particular *See v. Wash. Metro. Area Transit Auth.*, 36 F.3d 375 (4th Cir. 1994), and *Wood v. United States Dep't of Labor*, 112 F.3d 592, 597 (1st Cir. 1997).

---

[3] 33 U.S.C. §§ 901 *et seq.* This court has treated interpretations of the LHWCA as "helpful in construing" the District of Columbia Workers' Compensation Act. *See Young v. District of Columbia Dep't of Emp. Servs.*, 241 A.3d 826, 831–32 (D.C. 2020).

The ALJ also noted that in *Bowen v. Marriott Corp.*, Dir. Dkt No. 88-54 (January 2, 1992), the DOES Director, "expound[ing]" on *Joyner*, "decided that where a claimant moved only once and where the move was for economic reasons rather than to obtain an advantage over the employer, the claimant had not voluntarily limited her income."

With that background, the ALJ highlighted in her findings that petitioner had changed her residence only once since the time of her injury, did so "for economic reasons," and had declined to apply to potential employers in the District of Columbia metropolitan area (including Northern Virginia) out of fear that taking far-away job interviews would jeopardize her current job, which she had found without any assistance from her former employer. The ALJ found no evidence that petitioner had avoided reemployment or that the labor market in her new place of residence was depressed, noting to the contrary that the vocational counselor "had an optimistic outlook for [IT] Help Desk Technicians even for rural areas." Considering "all the relevant factors" and "particularly the inequities of the situation," the ALJ found that the location where petitioner resides (Scottsburg) and the hundred-mile area surrounding it is the relevant labor market. The ALJ concluded that petitioner had not voluntarily limited her income by unreasonably

refusing to accept vocational rehabilitation and was entitled to reinstatement of her partial disability benefits.

The intervenor appealed to the CRB. The CRB cited *Joyner* as establishing the "general rule" that "the District of Columbia and its environs [are] the relevant labor market for injured employees who reside in that market at the time of the injury." It reasoned that *Joyner* "accepted the general theoretical underpinnings of a default to the D.C. metropolitan area" as the relevant labor market, and did not do so "merely because of the specific facts of *Joyner*." The CRB determined that the ALJ had predicated her ruling "upon a finding that [petitioner's] move of nearly 200 miles was 'for financial reasons'" without "stat[ing] what those reasons were nor explain[ing] why the voluntary payments of temporary total disability benefits was insufficient to permit [petitioner] to remain in Fredericksburg where she resided at the time of the injury which occurred in the District of Columbia." The CRB therefore concluded that "[t]he ALJ's departure from the general rule is not sufficiently justified on this record" and reasoned that the cases cited by the ALJ were distinguishable in that "there is no claim in this case that [petitioner's] move was necessitated by the need to have family members care for her in convalescence." The CRB distinguished *Bowen* on the grounds that the claimant had moved only one mile away from her time-of-injury residence and that the case

had involved broadening but not "eliminating the labor market in which the claimant was employed at the time of the injury." The CRB reversed the CO on the ground that the ALJ's "determination that the Washington D.C. metropolitan area is not the relevant labor market is not in accordance with the law." This petition for review followed.

## II.

The following principles guide our analysis. "If substantial evidence exists to support the ALJ's findings, the existence of substantial evidence to the contrary does not permit the CRB to substitute its judgment for that of the ALJ." *Hensley v. District of Columbia Dep't of Emp. Servs.*, 49 A.3d 1195, 1199 (D.C. 2012) (cleaned up). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ferreira v. District of Columbia Dep't of Emp. Servs.*, 667 A.2d 310, 312 (D.C. 1995) (quoting *James v. District of Columbia Dep't of Emp.'t Serv.*, 632 A.2d 395, 397 (D.C. 1993)) (internal quotation marks omitted). We must determine "whether the CRB's conclusions flow rationally from th[e] findings and comport with the applicable law." *Payne v. District of Columbia Dep't of Emp. Servs*, 99 A.3d 665, 671 (D.C. 2014) (citation omitted). More generally, "[t]his court's task is to

determine whether the CRB's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Hensley,* 49 A.3d at 1199 (quoting *Muhammad v. District of Columbia Dep't of Emp. Servs.*, 34 A.3d 488, 491 (D.C. 2012)) (internal quotation marks omitted). "We are not obliged to stand aside and affirm an administrative determination which reflects a misconception, faulty application, or failure to conduct any analysis of the applicable law." *American Fed'n of Gov. Emps. Nat'l Office v. District of Columbia Pub. Emp. Rels. Bd.*, 237 A.3d 81, 85–86 (D.C. 2020) (cleaned up). Our guiding star in workers' compensation cases is that of "reasonableness." 2 A. Larson, *Law of Workmen's Compensation* § 57.61(d), at 10-489 (1992).

## III.

Our review in this case leads us to conclude that the ALJ's finding about petitioner's "economic reasons" for her move was supported by substantial evidence; that the CRB's conclusion about "insufficient justification" reflects an unwarranted assumption about the timing of petitioner's receipt of the voluntary disability payments made by the intervenor; that the CRB failed adequately to explain why it rejected the flexible approach it followed in *Bowen*; and that the CRB too narrowly interpreted this court's decision in *Joyner*.

We begin with the CRB's reasoning that the ALJ failed to state what economic reasons led petitioner to move nearly 200 miles away.  To the contrary, the ALJ's finding that petitioner moved to Scottsburg for "financial reasons" was accompanied by a citation to page eighteen of the hearing transcript, which contains petitioner's testimony (implicitly credited by the ALJ) that she moved back to her permanent residence because she "wasn't able to pay the rent" in Fredericksburg.  Further, petitioner testified that she was "without a job for basically a year," that after being told by the intervenor that she could not come back to work in a light-duty capacity, she began to look for work because she "had to," and that obtaining her IT job had enabled her to pull herself out of a "lack of income situation."[4]  That testimony, which the ALJ was entitled to credit, was substantial evidence supporting the ALJ's finding that petitioner had economic or financial reasons for her relocation.

The CRB's statement that the ALJ failed to explain "why the voluntary payments of temporary total disability benefits w[ere] insufficient to permit [petitioner] to remain . . . where she resided at the time of the injury" appears to

---

[4] Thus, the intervenor is incorrect in asserting that "[i]n Petitioner's Brief, she alleges for the first time, financial hardship from October 30, 2015 through May 26, 2016."

reflect an assumption that intervenor's voluntary payments of temporary total disability benefits were timely and would have been sufficient to permit petitioner to continue living in Fredericksburg. However, as described in footnote 1 *supra*, the Appendix to petitioner's brief contains copies of checks and check stubs that appear to indicate that large payments of benefits were made only retroactively, i.e., in December 2016 for the period from November 2015 to December 2016 and a subsequent period. The Appendix also contains a copy of a March 9, 2016, Memorandum of Informal Conference recommending "that the claimant receive TTD benefits from [March 9, 2016] to present and continuing or until modified and [that] the carrier authorize all c[ausally] related medical treatment" and requiring a showing of compliance within fourteen days. These materials are not in the agency record, and thus we may not rely on them as proof that the intervenor's payments to petitioner were delayed. But because the record itself nowhere contains evidence about when petitioner actually received payments of temporary total disability benefits, and especially given that the petitioner was pro se before the ALJ and the CRB (and explained to the ALJ that her lawyer had discouraged her from requesting a hearing and had informed her that he "didn't want to be [her] lawyer anymore"), the CRB should not have relied on an assumption about contemporaneous benefit payments, for which there was no

documentary support in the record, to reject the ALJ's finding that petitioner had financial reasons for her relocation.

Further, a comparison of the CRB's decision in the instant case to its decision in *Bowen* shows that the CRB has not "scythed a clear and consistent path" on the issue of what factors may be taken into account for purposes of determining the relevant labor market for a claimant who has relocated since his injury. *Wood*, 112 F.3d at 596. The CRB was correct that the claimant in *Bowen* moved only a short distance (a mile) and remained within the Washington, D.C. metropolitan area, but the significance of *Bowen* for the instant case is the CRB's reasoning there that the relevant labor market depended on travel time to and from the claimant's new residence. Rejecting the employer's contention that "after taking into consideration the traffic and other factors . . . claimant has limited her job search to a geographical area that is unreasonably small," the CRB explained that there was "no evidence in the record to support a finding that claimant moved to Olney, Maryland to thwart employer's efforts to prove the availability of suitable employment," that claimant had "moved only once," and that she had "relocated for economic reasons rather than to achieve an advantage over claimants who remain in the District of Columbia or areas of closer proximity than Olney, Maryland." Because the CRB did not explain why the ALJ could not rely on

comparable factors in the instant case, we are constrained to conclude that the CRB's rejection of the ALJ's analysis was arbitrary and cannot stand. *See Office of People's Counsel v. Pub. Serv. Comm'n*, 610 A.2d 240, 247 (D.C. 1992) ("In the event that an agency departs from its own policy, it must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (citation and internal quotation marks omitted); *see also ABM Onsite Servs.-West, Inc. v. NLRB*, 849 F.3d 1137, 1146 (D.C. Cir. 2017) (explaining that an agency may not "turn its back on its own precedent and policy without reasoned explanation," and when it "fails to explain . . . its deviation from established precedent, its decision will be vacated as arbitrary and capricious.")

Finally, the CRB misinterpreted this court's opinion in *Joyner*. In *Joyner*, a vocational rehabilitation expert had found three suitable employment leads for the injured claimant, which the claimant did not pursue. *See* 502 A.2d at 1028–29. But, unlike petitioner in the instant case, claimant Joyner remained unemployed, and had relocated five times throughout the country in the two years between her injury and her hearing. *Id*. at 1028. We noted that because the District's Workers' Compensation Act "does not expressly address *where* 'employment commensurate with the claimant's abilities' must be located to be relevant to determining whether a claimant has voluntarily limited her income," DOES was required to "fill in a

legislative interstice" to answer that question. *Id*. at 1030. We noted that the agency had "opted for the interpretation that the District of Columbia market should be the relevant labor market on the reasonable ground that the analogous [LHWCA] . . . has been similarly interpreted." *Id*. We further noted the agency's reasoning that if the relevant labor market were deemed to be the claimant's place of residence, in Joyner's case "the relevant labor market would have shifted five times in only two years," imposing "the unduly onerous burden on employers of analyzing a different labor market every time a claimant moves." *Id*. We also recognized the agency's reasoning that this could enable claimants to "effectively thwart employer efforts to prove the availability of suitable employment simply by moving to depressed areas of the country where suitable employment might well not be available." *Id*.

Citing those adverse consequences and endorsing "the agency's reliance on a harmonious construction of the LHWCA," *id.*, we upheld as reasonable the agency's interpretation that the Washington, D.C. metropolitan area was the relevant labor market, "rather than such other place a claimant may reside." *Id*. at 1029, 1031. We added the following:

> We are . . . unpersuaded by petitioner's argument that the DOES construction would penalize an injured claimant who was required for financial reasons to move to a

> distant location in order to be cared for by relatives. The Department would certainly consider such circumstances in determining whether a claimant had "voluntarily" limited her income or failed to accept suitable employment. Similar considerations would exist in the case of a claimant who was required to move for reasons of health[.]

*Id.* at 1030 n.3.

In the instant case, rather than considering petitioner's circumstances, the CRB applied an inflexible general rule that the relevant labor market is the Washington, D.C. area and gave no attention to how case law had developed in analogous LHWCA cases, even though this court's decision in *Joyner* imposed no such inflexible rule, and even though we endorsed the agency's effort to harmonize its approach with the outcomes in LHWCA cases. The CRB took that approach even though the record in this case includes several facts that would appear to warrant a more flexible approach. These include the facts that the District of Columbia was not petitioner's regular workplace; that according to petitioner's credited testimony, she moved back to her hometown because she was without income and unable to pay rent, i.e., for financial reasons; that she moved only once; that she had already been living in the new location for months by the time she filed her claim for workers' compensation benefits; that she was not seeking to avoid work but rather had found work on her own, having taken the initiative to

retrain as an IT help desk technician; that she feared that missing entire days from work (because of the eight-hour round-trip travel time) to interview for jobs in the Washington, D.C. area would put her current job in jeopardy; and that no evidence was presented that the labor market where petitioner resides is depressed. When considering comparable circumstances in LHWCA cases, courts, as well as the Department of Labor Benefits Review Board, have agreed that the relevant labor market is where the claimant resides.[5]

---

[5] *See* is of particular interest because, like the instant case, it involved a bus operator who lived in Virginia but was injured in the District of Columbia, and who moved (in See's case, to West Virginia), "abandon[ing]" the residence where he lived at the time of his injury, for "legitimate economic reasons," well before he filed his claim for workers' compensation benefits. 36 F.3d at 378, 383. The Fourth Circuit rejected the proposition "that the relevant labor market is always the location where the claimant was injured," explaining that "[a] move predicated on a legitimate intent to reduce an injured claimant's cost of living is consistent with the LHWCA's perception of disability as a physical and economic concept, in that such relocation can mitigate the economic consequences of the claimant's impairment." *Id.* at 382–83. The Fourth Circuit further reasoned that where a claimant relocates for legitimate economic reasons, the focus of the availability of employment should generally be on the job market where the claimant presently lives rather than where he resided at the time of the injury, unless the claimant relocated to an area so economically depressed that job opportunities are "virtually unavailable"; chose a location "so geographically distant that the employer is unable, without extreme hardship, to obtain a reliable labor market survey"; or is "excessively transient after the injury." *Id.* (citing *Joyner*, 502 A.2d at 1030).

*Wood* endorsed *See's* "on the facts" approach and held that "the employee's chosen community is presumptively the proper choice for determining earning capacity, and that the employer bears the burden of showing that the original move, or a refusal to move again, is unjustified." 112 F.3d at 597. In *Elkins v. Kellogg,*

(continued…)

For all the foregoing reasons, we conclude that the CRB's decision cannot stand. We vacate the decision and remand the case for the CRB to reconsider its ruling while accepting the ALJ's finding of "financial reasons" that we have determined is supported by substantial evidence, understanding that it is not constrained by *Joyner* in resolving this case on its facts; and explaining (if that is the CRB's conclusion) why the factors identified by the CRB in *Bowen* and in LHWCA cases such as *See* do not warrant a conclusion that the relevant labor market in this case is the area where petitioner currently resides. It is

*So ordered*.

---

(…continued)
*Brown & Root Serv., Inc.*, 50 BRBS 309 (Apr. 8, 2016), the Benefits Review Board, which "issue[s] decisions on appeals of worker's compensation claims arising under the [LHWCA]" *Young*, 241 A.3d at 831 n.15, and "is the federal counterpart of the CRB," *id.*, at 831, relied upon the factors identified in *See* and *Wood* and took into account the fact that the claimant's relocation was legitimately motivated and mitigated the economic consequences of his disability, that his ties to where he relocated were substantial, and that the town was not so remote or economically depressed as to prejudice the employer).